RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0126p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

PROFIT PET; BOB BARAN,

     *Plaintiffs-Appellees,*

  *v.*

ARTHUR DOGSWELL, LLC,

     *Defendant-Appellant.*

No. 09-1228

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00973—Robert J. Jonker, District Judge.

Argued: January 12, 2010

Decided and Filed: May 7, 2010

Before: MARTIN and WHITE, Circuit Judges; ZOUHARY, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Stephen S. Muhich, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, for Appellant. Loyst Fletcher, Jr., LAW OFFICE, Flint, Michigan, for Appellees. **ON BRIEF:** Stephen S. Muhich, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, for Appellant. Loyst Fletcher, Jr., LAW OFFICE, Flint, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

  ZOUHARY, District Judge.

───────────────────

  [*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

## INTRODUCTION

This is a contractual relationship gone to the dogs. It is a dispute between a pet supply manufacturer, Arthur Dogswell, LLC (Dogswell), and its Midwestern sales representative, Profit Pet. Dogswell terminated the contract between the parties after three years, and Profit Pet sued alleging (1) Dogswell terminated the contract without cause, as defined by the contract, and (2) Profit Pet was entitled to certain payments. After cross motions for summary judgment, the district court ruled at a hearing in Profit Pet's favor. The parties stipulated to an agreed damage amount based on the court's ruling, and judgment was entered in favor of Profit Pet in the amount of $209,039.56. Dogswell timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

There are four issues in this case:

1.     Did Dogswell terminate the contract "for cause" or "without cause," as those terms are defined in the contract?

2.     Did Profit Pet breach the contract prior to the termination?

3.     Is Profit Pet entitled to commissions on sales to "big box" stores located in its geographic sales territory?

4.     Does the Michigan Sales Representative Commission Act (SRCA) apply to any payment owed to Profit Pet?

For the reasons described below, we **AFFIRM** the district court's rulings that the termination was without cause and that Profit Pet did not breach the contract, **REVERSE** the district court's holdings on big box commissions and the applicability of the SRCA, and **REMAND** the case for further proceedings consistent with this Opinion.

## BACKGROUND

### *The Parties*

Marco Giannini formed Dogswell in 2003. Dogswell manufactures and sells pet products including pet foods and treats. Bob Baran does business as Profit Pet. Profit Pet is a sales representative for pet product manufacturers.

### *The Agreement*

In August 2004, Dogswell entered into a Representation Agreement ("Agreement") with Profit Pet, granting Profit Pet the exclusive right to represent Dogswell's products to distributors in eleven Midwestern states.[1]  Section 8.1 of the Agreement permitted modification or amendment by a writing signed by the parties.

The Agreement set forth the relationship between the parties as one of principal and independent contractor, with explicit language that Dogswell was concerned solely with sales by Profit Pet, and not how Profit Pet conducted its business (Section 5).  The parties agree the commission rate was 7%, although the rate was left blank in the Agreement.  No language in the Agreement precluded Profit Pet from representing competitors' products.

The Agreement distinguished terminations "for cause" and "without cause," and listed three specific "for cause" scenarios (Section 7.1):

- Profit Pet fails to sell $60,000 worth of goods on a quarterly basis, beginning in the second full quarter of the Agreement;

- Commission of a felony in the course of performance of the Agreement; or

- Failure to cure within fifteen days from a good faith written notice of breach or default.

If none of these events occurred, then the termination would be "without cause."  In addition, if Dogswell "terminates agency while [Profit Pet] is performing quarterly goals, [Profit Pet] is to receive 1 [year's] worth of commissions based on previous 6 month sales" (Section 7.2).

---

[1] The territory included Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio, and Wisconsin.

### *The March Toward Termination*

The parties began conducting business under the Agreement in August 2004. On March 20, 2007, Giannini and Baran had a conversation, memorialized later the same day in an e-mail that described Dogswell's desired "key performance metrics." Dogswell requested a reduced commission rate, that Profit Pet hire more employees, file certain reports with Dogswell, set up a meeting for a Dogswell employee with Pet Supplies Plus, and acquire an invitation for Dogswell to a Pet Supplies Plus open house (Doc. No. 37, Ex. D).

Baran responded on April 17, 2007 by affirming his "satisfaction" with the current Agreement and rejecting the suggestion that he hire additional staff or take a reduced commission. Giannini replied immediately with another e-mail, reiterating his desire that Profit Pet work with Pet Supplies Plus, hire a new employee, and expand -- "a major thing that we need to be added to continue to grow with you." He concluded the e-mail with: "I want to continue working with you, but if we are going to grow together, we need to have you grow your business. We have been growing our business . . . We ask you to do the same with a larger staff." Baran e-mailed a response explaining that his "job is to sell," and that he was not in a position to hire a new employee.

Dogswell terminated the business relationship by e-mail on June 18, 2007, followed the next day with a letter indicating Dogswell would pay Profit Pet all commissions earned through the end of June. Neither communication referenced the Agreement.

## ANALYSIS

### *Standard of Review*

This Court reviews a grant or denial of summary judgment *de novo*. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 450 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue

of material fact and that the moving party is entitled to a judgment as a matter of law." Federal Civil Rule 56(c).

The summary judgment standard does not change simply because the parties presented cross-motions. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The fact that both parties have moved for summary judgment does not mean a court must grant judgment as a matter of law for one side or the other; rather, a "court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

### Termination Without Cause

The first bone of contention here is whether Dogswell provided the required notice to Profit Pet in order to terminate the contractual relationship "for cause." The Agreement (Section 7.1) provides for three circumstances where termination is for cause: failure to meet the sales obligation, commission of a felony, and failure to cure after good faith notice of breach or default. Dogswell admits Profit Pet was meeting its quarterly sales obligation and there was no felony. Therefore, the issue is whether Dogswell sent a "good faith written notice" of Profit Pet's "actual breach or actual default" (Section 7.1.2). If it did, then Profit Pet had fifteen days to cure the breach. If it failed to do so, Dogswell could have terminated the Agreement by written notice ten days after the failure to cure. There is no dispute that the time period was adequate, or that Profit Pet failed to do what Dogswell demanded.

The district court held Dogswell did not provide the required "good faith written notice" (TR 49-56). The district court found the language in the e-mails to be "perfectly consistent with an ongoing business dialogue, . . . where one party would like to modify some terms of the agreement . . . but it doesn't specify default or breach as required under the notice and cure provision" (TR 52-53). This Court agrees. These e-mails request Profit Pet:

- lower the commission rate from 7% to 5%;
- hire employees so that it could "grow;"
- start filing certain business and customer reports; and

- attend a meeting with Pet Supplies Plus that a Dogswell employee could also attend, and acquire an invitation for Dogswell to attend a Pet Supplies Plus open house.

On their face, these e-mails are not notice of a breach.

Furthermore, Section 5 of the Agreement states:

[Profit Pet] is not an employee of [Dogswell] for any purpose whatsoever, but is an independent contractor. [Dogswell] is interested only in the results obtained by [Profit Pet], who shall have sole control of the manner and means of performing under this Agreement. [Dogswell] shall not have the right to require [Profit Pet] to do anything which would jeopardize the relationship of independent contractor between [Dogswell] and [Profit Pet].

Requests for Profit Pet to hire employees, set up meetings, or to file reports detailing its day-to-day operations do not describe or even imply a breach or default. Instead, they show Dogswell hounding Profit Pet to act contrary to Section 5 of the Agreement which clearly states Profit Pet "shall have sole control of the manner and means of performing."

Profit Pet's specific duties under the Agreement are limited to obtaining orders and "reorders" of Dogswell's products and services in the specified territory; "diligently" and "faithfully" working the territory in "an endeavor to secure business" for Dogswell (Section 4); and selling at least $60,000 worth of goods per quarter (Section 7.1). The e-mails specify no failure by Profit Pet to meet these or any other obligations under the Agreement. Indeed, the e-mails make no reference or citation to the Agreement.

Dogswell howls that the district court imposed a "hyper-technical notice requirement." Not so. The district court correctly held that a valid notice requires *some* reference to a breach with an opportunity for Profit Pet to cure. The e-mails contain no such reference. Because Dogswell failed to provide the required "good faith written notice" of breach or default, the termination of Profit Pet was without cause.

### *No Prior Breach by Profit Pet*

Michigan law does not allow a party who was the first to substantially breach a contract to later sue on the same contract. *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650; 522 N.W.2d 703, 706 (1994). Dogswell argues that, prior to the termination, Profit Pet breached the Agreement by representing competitors' products, and that Profit Pet is therefore barred from recovering for any later wrongful termination by Dogswell. This argument has no bite.

There is no language in the Agreement imposing a non-competition requirement on Profit Pet. The Agreement grants Profit Pet the exclusive right to represent Dogswell's products in certain states, thus limiting Dogswell's ability to contract with a competitor of Profit Pet (Section 1). But there is no similar language limiting Profit Pet. If the parties intended to restrict Profit Pet's ability to represent other manufacturers, a provision to that effect should have been included.

Nor can Dogswell rely on the Agreement's requirement that Profit Pet "use its best efforts to promote [Dogswell's] products" (Section 4). The district court summarized the issue well, stating "there's nothing that's inherently inconsistent with diligent and faithful work in the territory and best efforts to promote the principal's products with representing a competitor, particularly where there's no record that the plaintiff here represented particular products in competition with the principal's products" (TR 58).

Even if there were a non-competition requirement for Profit Pet, there is no factual basis for Dogswell's argument that Profit Pet sold competing products. Dogswell barks about statements made by Profit Pet owner Bob Baran in his deposition that he "rep'd" certain competitors during the same time he was representing Dogswell (Appellant's Brief, pp. 21-24). However, Baran does *not* say he represented products directly competing with Dogswell products. On the contrary, he clearly rejects any suggestion that he was representing a product in direct competition with Dogswell products (Baran Dep., p. 40). This, the *only* evidence of competition Dogswell offers,

is insufficient. The district court correctly held that Profit Pet did not substantially breach the Agreement prior to termination.

### *Big Box Store Commissions*

Dogswell argues the district court erred by holding Dogswell liable to Profit Pet for commissions on sales to "big-box" stores -- Target and United Natural Foods, Inc. (UNFI). The district court held that "the contract says [Profit Pet] gets commissions for materials or goods delivered into the territory to those accounts. And so I think he's entitled to those commission payments as a matter of law" (TR 60). We find the Agreement to be ambiguous on this point and reverse the district court's holding.

Under Michigan law, whether a contract is ambiguous is a question of law properly determined by the court. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998). In making such a determination, a district court should read the contract as a whole and give the contract language its ordinary and natural meaning. *See Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). However, a court's role in construing the terms of a contract is not unqualified. "Where [a contract's] meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." *D'Avanzo v. Wise & Marsac, P.C.*, 223 Mich. App. 314, 319; 565 N.W.2d 915, 918 (1997) (internal citations and quotation marks omitted). The fact-finder "must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning. In resolving such a question of fact, i.e., the interpretation of a contract whose language is ambiguous, the finder of fact is to consider relevant extrinsic evidence." *Klapp v. United Ins. Group Agency*, 468 Mich. 459, 469; 663 N.W.2d 447, 453-54 (2003).

The Agreement, a printed form modified by handwritten notes and cross outs, is not a model of clarity. The parties drafted it without the aid of an attorney, and frankly it is doggone messy. A number of fill-in spaces are left blank, including the commission rate, a not insignificant contract term. Whole sections are deleted by hand

with the notation "VOID" and the parties' initials.  Some sections, such as the penalty payment discussed below, are written entirely by hand and squeezed into what little white space existed between typed sections.  It is no wonder that ambiguity and inconsistency is the result.

Of course, the Agreement must be read as a whole and, in so doing, we find there are conflicting, but reasonable, interpretations whether Profit Pet is entitled to commissions on sales to big box stores.  If the words in a contract are equally susceptible to at least two reasonable interpretations, then the court must reverse the grant of summary judgment.  *Mayor of City of Lansing v. Mich. Pub. Serv. Comm'r*, 470 Mich. 154, 166 (2004).  Here, the Agreement does not consistently define terms.  Certain terms are defined by placing the term in quotes in a parenthetical after the definition.  For example, it does so for "Principal" and "Agency" in the preamble, "Products" and "Territory" in Section 1, "Sales Policies" in Section 2, and "aggrieved party" in Section 7.1.2.  Section 6 has the header "Commissions," but fails to similarly define the term, nor is "commissions" consistently capitalized when used.  (The Agreement treats the terms "orders" and "notices" in Sections 3 and 9, respectively, in similar fashion.)

Certainly Sections 4 and 6, read together, define commission in a way which comports to the common understanding of how commissions are earned and paid. *Coates v. Bastion Bros., Inc.*, 276 Mich. App. 498, 504; 741 N.W.2d 539, 544 (2007) ("Dictionary definitions may be used to ascertain the plain and ordinary meaning of terms undefined in an agreement.").  The word "commission" (in the sense of a payment) is understood in common parlance as a payment made to an agent regarding a sale for which the agent is responsible.  The *Webster's Third New International Dictionary* (1986) defines "commission" as "a fee paid to an agent or employee for transacting a piece of business or performing a service; especially: a percentage of the money received from a total paid to the agent responsible for the business."

Section 6.1, standing alone, is ambiguous.  That Section states: "Commissions are earned . . . on all 'accepted orders' solicited within and/or delivered to the Territory, whether the orders are sent by the Agency, received by the Principal by the mails, taken

at the Principal's place of business or otherwise." Does this provision limit commissions to those "earned" by Profit Pet performing its duties under Section 4? That Section explains that Profit Pet must "promote orders and reorders of [Dogswell's] products and services in the Territory and the long term goodwill of [Profit Pet]," and that Profit Pet "diligently and faithfully work the Territory in an endeavor to secure business for [Dogswell] and use its best efforts to promote [Dogswell's] products." It is undisputed that Profit Pet never secured big box store business, nor sought to promote Dogswell's products to the big box market. Therefore, one interpretation is that Profit Pet did not "earn" a commission for big box sales.

A different and also reasonable interpretation of the Agreement was found by the district court: namely, that Profit Pet would be entitled to commissions on all orders "delivered to" the Territory, regardless of whether Profit Pet had affected those sales. This interpretation was reached by focusing on the broad language of Section 6.1.

In sum, the Agreement is ambiguous as to big box store commissions. The issue is one for the trier of fact to decide.[2]

Having determined the Agreement is ambiguous, the trier of fact can also consider evidence outside the four corners of the Agreement, including the parties' course of conduct. The parties agree that Profit Pet never represented Dogswell's products to Target or UNFI, and Profit Pet never received or demanded a commission on such sales until *after* this lawsuit. This past pattern of conduct between the parties during the pendency of the Agreement supports the reasonable interpretation that big box store commissions were not included in the Agreement. *See Detroit Greyhound Employees Fed. Credit Union v. Aetna Life Ins. Co.*, 381 Mich. 683, 692; 167 N.W.2d 274, 279 (1969) ("whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be").

---

[2]Furthermore, even were the Agreement clear and unambiguous, the Agreement lacks an integration clause, and the district court did not examine whether the Agreement was intended to be integrated or whether there was a prior or contemporaneous agreement addressing the big box store commissions, as there was addressing the commission rate. *See NAG Enters., Inc. v. All State Indus., Inc.*, 407 Mich. 407, 409-10; 285 N.W.2d 770, 771-72 (1979) (parol evidence rule applies only after finding that parties intended contract to be complete integration of their agreement).

Finally, the parties stipulated to a damage amount in light of the district court's ruling that Profit Pet was entitled to big box commissions, resulting in the judgment of $209,039.56 in favor of Profit Pet. That stipulation does not specify the amount attributable to big box commissions. There is no mention of the value of the big box commissions in the briefing or elsewhere in the record. Therefore, should the trier of fact find big box commissions inappropriate, a recalculation of damages would be necessary (deducting any dollar amount for big box commissions).

### *The Michigan Sales Representative Commission Act*

The district court held that the SRCA applied to the "without cause" payment authorized in Section 7.2 of the Agreement. This was error.

The SRCA states that a principal is liable to the sales representative for actual damages, and "if the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000.00, whichever is less." M.C.L. § 600.2961(5). The statute defines "commission" as "compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits." M.C.L. § 600.2961(1)(a).

Section 6.1 describes the commission limiting it to those sales "substantially attributable in whole or in part to activities and services performed prior to the effective date of termination, regardless of the shipment and invoice date." The Agreement next provides a penalty for termination without cause. Section 7.2 states: "If [Dogswell] terminates agency while [Profit Pet] is performing quarterly goals, [Profit Pet] is to receive 1 [year's] worth of commissions based on previous 6 month sales."

Although the penalty payment is calculated based upon the previous six months' sales, Profit Pet has *already* been paid a commission on those sales. In other words, Profit Pet, having already been paid the last six months' commissions on its sales, is entitled under the Agreement to receive an additional payment equaling a year's worth

of commissions as damages for the termination of its agency -- not for additional work done or sales accomplished.  The one year's commission is a contractual penalty, not a commission envisioned by the SRCA, and the SRCA simply does not apply. Any argument to the contrary is barking up the wrong tree, and a misreading of both the Agreement and the statute.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order that Dogswell terminated the contract without cause, **REVERSE** the district court's order that Profit Pet is due big box store commissions and that the SRCA applies to the without cause termination penalty payment, and **REMAND** for further proceedings consistent with these rulings.