NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0209n.06

Nos. 12-1593/12-1659

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Feb 28, 2013***

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SIEGER ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff-Appellant/ | ) | |
| Cross-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| ULTRA MANUFACTURING LIMITED, | ) | |
| | ) | |
| Defendant-Appellee/ | ) | |
| Cross-Appellant, | | |

Before:  MOORE, SUTTON and DONALD, Circuit Judges.

SUTTON, Circuit Judge.  Sieger Enterprises and Ultra Manufacturing entered into a sales contract.  When things fell apart, Sieger claimed that Ultra owed it unpaid sales commissions of more than $1.5 million.  The district court agreed in part and disagreed in part.  We affirm.

I.

Ultra is a Canadian company that makes parts for auto interiors—dashboard panels, cup holders and the like.  In 2000, Ultra made Sieger the sales agent for its plastic components, though not for its engineering and design services.  The contract allowed either party to discontinue the relationship by giving sixty days' notice.  The arrangement worked for a few years.  In 2003, Ultra realized it had overpaid the commissions due under the contract by including packaging and design

costs in the commission base. As a result, beginning in November 2003, Ultra no longer included these costs in the base for Sieger's commissions.

The relationship faced a new problem in 2004. Sieger had been trying with mixed success to sell Ultra's products to Lear Corporation, an intermediary that buys from parts manufacturers and sells to auto makers. In the midst of negotiations between Sieger and Lear in February 2004 over a potential transaction, Ultra decided its own sales manager could do a better job closing the deal than Sieger could. On February 24, Ultra notified Sieger in writing that their contract would expire in sixty days. Because Ultra was Sieger's only major client at the time, Sieger went out of business after the contract expired.

Ultra continued to work with Lear and eventually submitted a successful bid for a portion of Lear's business. The project included a design phase, in which Ultra designed and engineered parts, and a production phase, in which Ultra manufactured and shipped the parts to Lear. Under this arrangement, Ultra supplied parts to Lear without incident until 2009.

In 2009, Sieger filed this lawsuit in Michigan state court, claiming Ultra had breached the sales contract with Sieger by failing to pay commissions on the parts it sold to Lear. Sieger added two theories of relief unrelated to the Lear account: commissions for packaging and design costs on parts sold after November 2003, and statutory double damages for six months of commissions Ultra never paid. Ultra removed the case to federal court. After discovery, the district court granted partial

summary judgment in favor of Ultra on the design costs and the Lear commissions and in favor of Sieger on the packaging costs and double damages. The parties appealed their respective losses.

II.

These appeals raise three questions: Does Ultra owe Sieger commissions on the Lear sales? Does Ultra owe Sieger commissions on design and packaging costs for sales from November 2003 to the end of their contract in April 2004? And does Ultra owe Sieger double damages for late-paid commissions?

*Sales to Lear.* Sieger seeks $1.5 million in commissions on Ultra's $40 million deal with the Lear company. This claim starts with the language of the Ultra-Sieger contract and, regrettably for Sieger, ends there.

Under the Ultra-Sieger contract, "Sieger shall receive commissions . . . [f]or all billings for parts . . . provided a *purchase order* is received within 120 days from the date of termination." R.36-3 at 3–4 (emphasis added). Noting that the Ultra-Sieger contract ended on April 24, 2004, and that the Ultra-Lear contract started on April 15, 2004, Sieger claims that Ultra owes commissions on all later sales to Lear. The problem is that the April 2004 Ultra-Lear contract was not a "purchase order." For one, the parties did not call it a purchase order—a "document authorizing a seller to deliver goods with payment to be made later." Black's Law Dictionary 1354 (9th ed. 2009). The parties instead called it an "Early Sourcing Target Agreement." R.37-3 at 1.

For another, the contract did not function as a purchase order. The "early sourcing" agreement authorized Ultra to perform "design and development" services, not to deliver goods. R.37-3 at 3. Lear's project proceeded in two phases: design first, production second. The "sourcing" agreement concerned just the first phase: design.

For still another reason, the contract distinguishes between "purchase orders," which are covered by the Ultra-Sieger deal, and preliminary design and engineering services, which are not. A read through the Ultra-Lear contract reveals that it includes design and engineering requirements and excludes production. "Lear will have no further obligation," it says, "outside of the incurred [engineering research & design] costs detailed within . . . this ESTA, if no Purchase Order for Production issue[s]." R.37-3 at 2. The agreement says nothing about the quantity of goods for delivery or terms of shipment. It does not authorize the delivery of any goods. It instead authorizes engineering services alone and contemplates, but does not commit to, purchase orders down the road. Not until March 2006, more than a year after the 120-day period expired, did Lear issue a "Production Purchase Order" for Ultra to manufacture and deliver parts. R.38-5. The Ultra-Sieger contract simply does not cover purchases ordered in March 2006 and thereafter.

Sieger insists that the early sourcing agreement amounts to the functional equivalent of a purchase order because it represented "a commitment by Lear to purchase the parts from Ultra." Appellant's Br. at 26. Not so. Far from committing Lear to purchase parts from Ultra, the agreement says in no uncertain terms that Lear has "no further obligation . . . if no Purchase Order for Production issue[s]." R.37-3 at 2. Sieger persists that "purchase order" has an unusual meaning

- 4 -

in the automotive industry, one that coincides with the sourcing agreement between Ultra and Lear. Appellant's Br. at 16–17. But other than statements in its brief to this effect, Sieger offers no evidence of such a custom or any evidence that the parties assumed such a custom would govern a contract that places Lear under no obligation to purchase anything covered by the Ultra-Sieger sales contract.

One step further removed from the terms of the contract, Sieger argues that Ultra unfairly benefitted from the groundwork Sieger laid. "Obtaining the right to submit a bid is the most important aspect of selling the business," Sieger claims, and Ultra waited until Sieger had done the initial legwork of gaining access to Lear's bidding process, then pulled the plug on the sales agent, allowing Ultra to enjoy the fruits of Sieger's labor without paying for it. Appellant's Br. at 16. Ultra counters that it terminated the contract due to Sieger's dwindling sales force and substandard sales success. It is not clear who holds the higher moral ground. But it is clear that the one thing both parties could control and the one thing they agreed about in terms of who would pay for what—the contract language governing commissions on post-termination sales—does not apply to the Lear contract. No doubt Sieger might have convinced Ultra to make a broader promise, extending the 120-day period itself or requiring Ultra to pay commissions on other types of contracts, but presumably that would have lowered Sieger's commissions or led to other concessions on its part. Either way, we must take the contract as we find it, and this contract does not obligate Ultra to pay commissions on purchase orders from Lear that were not submitted until 2006.

*Design and packaging costs.* Sieger separately claims that Ultra should have paid commissions on design and packaging costs that Ultra charged its customers because the contract entitles Sieger to commissions on Ultra's "gross sales." R.36-3 at 2. This argument fails as well, at least with respect to design costs. The contract authorizes Sieger to "sell and promote [Ultra's] products, as noted in exhibit B." *Id.* Exhibit B defines "Products" as "Plastic Components & Assemblies (Excludes all Prototypes, Design, Development, & Tooling Costs)." *Id.* at 5. Ultra in return must "pay [Sieger] a monthly commission . . . of gross sales." *Id.* at 2. Together, these terms undermine Sieger's contention that Ultra owes commissions for design costs. The contract obligates Ultra to pay commissions on "gross sales," but it ties "gross sales" to "products"—the only things Sieger is authorized to sell—and excludes Ultra's "design, development, and tooling" costs from the definition of "products."

Sieger counters that "gross sales" means the total sales price charged to the customer. While that may be true in the abstract, we do not read contracts in the abstract. *See Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 314 (6th Cir. 2010). "Gross sales" in context means gross sales of "products, as noted in Exhibit B," and Exhibit B excludes design costs from the definition of "products." R.36-3 at 1, 5.

Packaging costs are another matter. The contract says nothing about them, and neither party provides evidence of any custom in the industry. But the contract sets an inclusive baseline by referring to "gross sales" of "products" and listing some exceptions. In addition to "design, development, and tooling costs," *id.* at 5, the contract excludes from gross sales "deductions, credits,

returns, discounts, and freight on shipments," *id.* at 1. Packaging costs, like a missing tooth, amount to a conspicuous gap in this list. In the absence of an exception for packaging costs, the contract fairly includes them within the meaning of "gross sales" of "products." Ultra insists that anything not affirmatively included in the definition of "products" falls outside of "gross sales." Yet that is not how the parties structured the contract. It contains a broad baseline with a list of exceptions, not a narrow baseline with a list of inclusions. At least some costs must reasonably be implied in the meaning of "plastic components and assemblies." Think of labor, management, safety costs, regulatory compliance expenses, utilities and other overhead. A company faces an array of costs in generating gross sales, and the price customers pay takes all of those costs into account. Unless the contract provides a reason to exclude one of those costs from the sales price, all of them would naturally fall within "gross sales." The contract says nothing about excluding packaging, and it thus obligates Ultra to pay commissions on those costs.

*Statutory double damages.* Sieger also seeks damages under the Michigan Sales Representative's Commission Act. *See* Mich. Comp. Laws § 600.2961. Two provisions support Sieger's claim. First, commissions "shall be paid within 45 days after the date on which the commission became due." *Id.* § 600.2961(4). Second, if a principal "intentionally fail[s] to pay the commission" on time, the principal must pay "2 times the amount of commissions." *Id.* § 600.2961(5)(b).

Under these provisions, Ultra is liable for two categories of unpaid commissions. The first is commissions on packaging costs, which (as noted) Ultra refused to pay after November 2003. The

second is commissions for products sold (other than those to Lear) between July 2006 and October 2006, for which Ultra acknowledges responsibility.

Without disputing these facts, Ultra argues that its nonpayment was a good-faith mistake and that as a result the statute does not apply. But the Michigan Supreme Court has interpreted the statute otherwise: the failure to pay is the act that must be intentional; it makes no difference that the employer believed it was not due. *See Kenneth Henes Special Projects Procurement, Mktg. & Consulting Corp. v. Cont'l Biomass Indus., Inc.* (*In re Certified Question*), 659 N.W.2d 597, 600 (Mich. 2003). "[I]f a principal deliberately fails to pay a commission when due, it is liable for double damages under the statute, even if the principal did not believe, reasonably or otherwise, that the commission was owed." *Id.* Ultra says "this case law should not be followed" because the Michigan Supreme Court's interpretation "is contrary to good sense." Appellee's Br. at 35. Be that as it may, we cannot blaze our own trail through the Michigan code. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

III.

For these reasons, we affirm.