NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0432n.06

No. 12-3104

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 30, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| EMPLOYERS' FIRE INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| PROMEDICA HEALTH SYSTEMS, INC., | ) ) ) | |
| Defendant-Appellant. | ) ) ) | |

Before: GIBBONS and COOK, Circuit Judges; and ROSENTHAL, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** This case involves a dispute between an insurance provider, Employers' Fire Insurance Co. ("OneBeacon")[1] and one of its policyholders, ProMedica Health System, Inc. ("ProMedica"). OneBeacon denied coverage to ProMedica for the costs of defending administrative and civil actions brought by the Federal Trade Commission ("FTC") to enjoin ProMedica's acquisition of a suburban Toledo hospital. OneBeacon did so on the ground

---

[*]The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

[1]Employers' Fire Insurance Co. is a wholly-owned subsidiary of OneBeacon Insurance Group, Ltd.

-1-

that ProMedica failed to report the claim within the time period required by ProMedica's insurance policy. OneBeacon argues that a "claim" arose in August 2010 when the FTC began to formally investigate ProMedica's acquisition of the hospital. ProMedica argues that a "claim" did not arise until January 2011 when the FTC filed administrative and civil complaints against ProMedica, and, therefore, ProMedica's January 2011 notice to OneBeacon was timely. OneBeacon filed suit in district court, seeking a declaration that ProMedica is not entitled to coverage, and ProMedica filed a counterclaim seeking a declaration that OneBeacon is required to pay ProMedica's defense expenses. The district court granted summary judgment to OneBeacon, holding that a "claim" arose in August 2010, and ProMedica's failure to notify OneBeacon in a timely manner precludes coverage. We hold that a "claim" did not arise until January 2011 when the FTC initiated administrative and civil actions against ProMedica and that ProMedica's notification was therefore timely. We vacate the district court's grant of summary judgment to OneBeacon and remand this case to district court for further proceedings consistent with this opinion.

## I.

### A.

This case involves two essentially identical insurance policies: a policy that OneBeacon issued to ProMedica for the period from September 29, 2009 to September 29, 2010 (the "2009 Policy") and a renewal policy for the period from September 29, 2010 to September 29, 2011 (the "2010 Policy"). Each policy provides ProMedica with up to fifteen million dollars of Directors, Officers, and Organization liability coverage.

The policies at issue are "claims-made" policies, which cover "Loss from any Claim first made against [ProMedica] during the Policy Period or applicable Extended Reporting Period for a Wrongful Act; provided that such Claim is reported to the Underwriter in accordance with Section VIII of this Coverage Section."

The dispute in this case turns on when a "claim" arose. Both policies define "claim" to mean:

> (1) a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations); or
> (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief commenced by:
>> (a) the service of a complaint or similar pleading;
>> . . . .
>> (c) the filing of a notice of charges, formal investigative order or similar document,
> against an Insured for a Wrongful Act . . . .

The policies define "Wrongful Act" to include an "Antitrust Violation," which is defined to include "any actual or alleged . . . violation of . . . the Clayton Act of 1914 . . . [or] the Federal Trade Commission Act of 1914 . . . ."

Section VIII of the policies' coverage sections requires ProMedica to report claims to OneBeacon in order to receive coverage:

> [ProMedica] must, as a condition precedent to any right to coverage . . . give the Underwriter written notice of such Claim as soon as practicable after [ProMedica] first becomes aware of such Claim, and in no event later than:
>> (1) with respect to any Claim first made during the Policy Period, ninety (90) days after the end of the Policy Period; or
>> (2) with respect to any Claim first made during any applicable Extended Reporting Period, ninety (90) days after the end of the Extended Reporting Period.

The policies contain a "Related Claims" provision that addresses "all Claims . . . in any way involving the same or related facts . . . ." "Related Claims, whenever made, shall be deemed a single Claim made when the earliest of such Related Claims was first made . . . ."

The policies also include a "Notice of Circumstances" provision that gives ProMedica the option to report "Wrongful Acts" in order to ensure that future claims are covered:

> If, during the Policy Period, [ProMedica] first becomes aware of a specific Wrongful
> Act which may subsequently give rise to a Claim, and:
>> (1) gives the Underwriter written notice of such Wrongful
>> Act . . . before the end of the Policy Period; and
>> (2) requests coverage . . . for any Claim subsequently arising from
>> such Wrongful Act;
> then any Claim subsequently made against [ProMedica] arising out of such Wrongful
> Act shall . . . be treated as if it had been first made during the Policy Period.

**B.**

The facts of this case are undisputed. ProMedica operates a not-for-profit healthcare system serving northwest Ohio and southeast Michigan. Before the acquisition, St. Luke's Hospital ("St. Luke's") was an independent, not-for-profit hospital located in Maumee, Ohio, a suburb of Toledo. In May 2010, ProMedica and St. Luke's entered into an agreement (the "Joinder Agreement") by which the parties agreed that ProMedica would acquire St. Luke's. The Joinder Agreement provided that the transaction would close on July 30, 2010. The following events occurred while ProMedica's 2009 Policy was in effect.

On July 15, 2010, the FTC sent a letter to ProMedica informing ProMedica that it would be "conducting a non-public preliminary investigation to determine whether the acquisition of St. Luke's by ProMedica may be anticompetitive and in violation of Section 7 of the Clayton Act . . . or

Section 5 of the Federal Trade Commission Act . . . ." The letter advised ProMedica that if the FTC determined that the acquisition would have anticompetitive effects, the FTC could seek a preliminary injunction blocking or rescinding the acquisition. It also asked ProMedica to preserve documents and information related to the acquisition. On July 16, 2010, the FTC sent a second letter to ProMedica requesting copies of specified documents and additional information. The letter clarified that "[n]either this letter nor the existence of this non-public investigation should be construed as indicating that a violation has occurred or is occurring" and stated that the purpose of its request was to "determine whether further investigation of the acquisition is necessary."

On July 29, 2010, representatives from ProMedica and St. Luke's met with FTC staff members in Washington, D.C., to discuss the acquisition. ProMedica voluntarily agreed to delay closing of the transaction until August 27, 2010, to allow additional time for the FTC to complete its investigation.

On August 6, 2010, the FTC sent a letter to ProMedica stating that, as the parties had discussed, the FTC was transitioning its investigation to "full-phase" and expected to "authorize compulsory process shortly." The FTC stated that the investigation was likely to extend beyond the August 27, 2010 closing date. It discussed the possibility of a "Hold Separate Agreement," by which ProMedica would agree "for a limited time period" to limit the integration of St. Luke's into its healthcare system in order "to maintain the independent competitive viability of St. Luke's."

On August 9, 2010, the FTC issued a resolution authorizing the use of compulsory process in connection with its investigation. On August 10, 2010, the FTC sent a letter to ProMedica proposing the terms of the "Hold Separate Agreement" and "request[ed]" ProMedica to "agree to

certain limited constraints on its operations of [St. Luke's]" for sixty days after the consummation of the acquisition. ProMedica agreed to the Hold Separate Agreement on August 18, 2010.

On August 13, 2010, the FTC subpoenaed employees of ProMedica and St. Luke's. It also issued subpoenas *duces tecum* and Civil Investigative Demands ("CIDs") to the entities themselves on August 25, 2010. On August 31, 2010, ProMedica and St. Luke's completed the acquisition, subject to the Hold Separate Agreement.

Earlier in the month, on August 17, 2010, ProMedica's insurance broker had sent OneBeacon's underwriter an application to renew ProMedica's insurance policy. The application asked whether ProMedica had agreed to any mergers or acquisitions in the last eighteen months and whether it anticipated doing so during the next twelve months. ProMedica answered "[y]es, we are always contemplating new [mergers and acquisitions]," but it did not specifically mention its acquisition of St. Luke's. On September 27, 2010 OneBeacon agreed to renew ProMedica's insurance policy. The policy period for ProMedica's 2009 Policy ended on September 29, 2010, and the 2010 Policy took effect.

On January 6, 2011, the FTC commenced an administrative action against ProMedica, asserting that it "[had] reason to believe" that ProMedica's acquisition of St. Luke's violated Section 7 of the Clayton Act. The following day, on January 7, 2011, the FTC sued in district court for a temporary restraining order and a preliminary injunction enjoining ProMedica and St. Luke's from further consolidating their operations while the administrative action proceeded.

**C.**

On January 13, 2011, ProMedica notified OneBeacon of the litigation by the FTC. OneBeacon sent ProMedica a letter denying ProMedica's claim on May 10, 2011. OneBeacon explained that "a Claim . . . was first made on or around August 9, 2010, when the FTC issued a resolution authorizing the commencement of a formal investigation," or, alternatively, "the Claim was first made on or around August 18, 2010, when the Hold Separate Agreement was executed." The claim arose while the 2009 Policy was in effect, and pursuant to the policy's mandatory reporting provision, the claim had to be reported to OneBeacon no later than December 27, 2010. Because ProMedica did not notify OneBeacon of the claim until January 13, 2011, OneBeacon denied coverage under the 2009 Policy. OneBeacon also denied coverage under the 2010 Policy, invoking the "Related Claims" provision. Because the FTC's January 2011 actions were "a mere continuation of the FTC Investigation and/or the Hold Separate Agreement," the actions were "related" to the investigation and Hold Separate Agreement. As a result, the FTC actions, the FTC investigation, and the Hold Separate Agreement were "deemed to be a single Claim that was first made at the time the FTC Investigation Claim was made." Alternatively, OneBeacon argued that even if the FTC actions constituted a distinct claim that was made during the 2010 Policy, coverage was barred because ProMedica failed to disclose the St. Luke's acquisition and the FTC's investigation of the acquisition in its application for the 2010 Policy.

On the same day that OneBeacon denied coverage to ProMedica, it filed an action in district court seeking a declaration that ProMedica is not entitled to coverage under the 2009 and 2010 policies. It also sought declarations that ProMedica is equitably estopped from seeking coverage

under the 2010 Policy because of its failure to disclose the St. Luke's acquisition and that there is no coverage under the 2010 Policy because the FTC claim constitutes a known loss or loss that was in progress before the 2010 Policy took effect. ProMedica filed an answer and a counterclaim seeking a declaration that the 2010 Policy covers the expenses that ProMedica incurred in defending the FTC's administrative and civil actions. The district court ordered the parties to file cross-motions for summary judgment addressing only whether ProMedica timely notified OneBeacon of its claim. The district court granted summary judgment to OneBeacon, finding that a claim arose in August 2010 and that ProMedica's failure to notify OneBeacon of the claim until January 2011 precludes coverage under the 2009 Policy.[2]

## II.

We review a district court's grant or denial of summary judgment *de novo*. *Profit Pet v. Arthur Dogswell, LLC* 603 F.3d 308, 311 (6th Cir. 2010) (citing *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 450 (6th Cir. 2005)). The parties agree that the insurance contracts at issue were made in Ohio and that Ohio law governs this matter.

Under Ohio law, an insurance policy "is a contract and like any other contract is to be given a reasonable construction in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001) (quoting *Dealers Dairy Prods. Co. v. Royal Ins. Co.* 164 N.E.2d 745, 747 (Ohio 1960)). "When the language of a written contract is clear, a court may

---

[2]The district court did not directly address the 2010 Policy.

look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.* (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000)).

The definition of a "claim" in ProMedica's insurance policies is unambiguous. It is also clear that none of the actions taken by the FTC in August 2010, viewed individually or taken together, satisfy all of the requirements for a "claim." Four elements are required for a claim: (1) there must be a "written demand" or a "proceeding" "commenced by" "a complaint or similar pleading" or "the filing of a . . . formal investigative order"; (2) the "demand" or "proceeding" must seek "monetary, non-monetary or injunctive relief"; (3) relief must be sought "against an Insured"; and (4) relief must be "for a Wrongful Act," as defined by the policy. Because the parties devote most of their arguments to whether there was a "Wrongful Act" in August 2010, as required by the fourth element of a "claim," we consider this issue first. We then consider whether each of the FTC's August 2010 actions meets the other elements of a "claim." We conclude that neither the FTC's August 6, 2010 letter marking the transition to "full-phase" investigation, nor the FTC's August 9, 2010 resolution authorizing the use of compulsory process, nor the subpoenas and CIDs issued by the FTC, nor the Hold Separate Agreement meets all of the elements of a "claim."

**A.**

ProMedica argues that none of the FTC's August 2010 actions constitutes a "claim" because none of them seeks relief for a "Wrongful Act," as required by the fourth element of a "claim." In this context, a "Wrongful Act" is "any actual or alleged" antitrust violation. ProMedica argues that

in August 2010, the FTC was *investigating* whether an antitrust violation had occurred or would

occur if ProMedica acquired St. Luke's; it had not yet *alleged* that an antitrust violation had occurred

or would occur. OneBeacon concedes that not every "investigation" necessarily involves an

"allegation" but argues that, in this case, the FTC *did* allege that ProMedica had committed an

antitrust violation. OneBeacon contends that the FTC's August 6, 2010, letter informing ProMedica

that the FTC was transitioning its investigation to "full-phase," the FTC's August 9, 2010, resolution

authorizing the use of compulsory process, and the subsequent subpoenas and CIDs should have

made it "readily apparent" to ProMedica that the FTC alleged antitrust violations.

The policies at issue do not define "alleged." When a term in an insurance policy is

undefined, Ohio courts give the term "its common, ordinary, usual meaning." *Shear v. W. Am. Ins.

Co.*, 464 N.E.2d 545, 548 (Ohio 1984) (citing *McBride v. Prudential Ins. Co.*, 72 N.E.2d 98, 99

(Ohio 1947)). When an undefined term has a "plain and ordinary meaning," it is "unnecessary and

impermissible for a court to resort to construction of that language." *Nationwide Mut. Fire Ins. Co.*,

652 N.E.2d at 686 (citing *Karabin v. State Auto. Mut. Ins. Co.*, 462 N.E.2d 403, 406 (Ohio 1984));

*see also United Ohio Ins. Co. v. Brooks*, No. 12-11-04, 2012 WL 1099821, at *4 (Ohio Ct. App.

2012) (slip copy) ("When the language of a written contract is clear, a court may look no further than

the writing itself to find the intent of the parties.") (citing *Alexander*, 374 N.E.2d at 150). An

"allegation" is "the act of declaring something to be true" or "something declared or asserted as a

matter of fact, esp. in a legal pleading; a party's formal statement of a factual matter as being true

or provable, without its having yet been proved." *Black's Law Dictionary* 86 (9th ed. 2009). As

used as an adjective, "alleged" means "asserted to be true as described" or "accused but not yet

tried." *Id.* at 87; *see also American Heritage Dictionary* 94 (2d ed. 1976) (defining "alleged" as

"represented as existing or as being as described but not so proved; supposed").

In August 2010, the FTC did not "assert to be true" or "declare" that antitrust violations had

occurred or would occur if ProMedica acquired St. Luke's. Rather, the communications that

ProMedica received from the FTC only indicated that the FTC sought to determine "whether" such

violations had occurred or would occur. The July 2010 letters that ProMedica received announcing

the FTC's preliminary investigation stated that "[n]either this letter nor the existence of this non-

public investigation should be construed as indicating that a violation has occurred or is occurring"

and stated that the FTC sought only to determine whether further investigation was necessary. The

FTC's subsequent communications to ProMedica lacked such a disclaimer, but even after the FTC

launched its "full-phase" investigation in early August, the FTC stopped short of asserting that

ProMedica had committed antitrust violations. The FTC's August 9, 2010, resolution authorizing

the use of compulsory process stated that the FTC sought only "to determine *whether*" ProMedica's

acquisition of St. Luke's, if consummated, would violate antitrust laws. Similarly, the CIDs stated

that they were issued "in the course of an investigation to determine *whether* there is, has been, or

may be a violation" of laws administered by the FTC. The use of the word "whether" does not

always or necessarily mean that there is no allegation of wrongdoing. But the FTC's use of the word

in its communications to ProMedica, viewed in context, underscores the fact that the FTC did not

affirmatively accuse ProMedica of antitrust violations. Rather, it simply discussed in hypothetical

terms the possibility that an antitrust violation had or would occur. This is not enough to "allege"

wrongdoing.

The FTC did not "allege" antitrust violations until January 6, 2011, when it commenced an administrative action against ProMedica, asserting that it "[had] reason to believe" that ProMedica's acquisition of St. Luke's violated Section 7 of the Clayton Act and describing the specific ways that it believed the acquisition would impair competition. The press release that accompanied the FTC's filing of its administrative complaint supports this view. The release explained that "[t]he Commission issues or files a complaint when it has 'reason to believe' that the law has been or is being violated . . . ." Press Release, Federal Trade Commission, FTC and Ohio Attorney General Challenge ProMedica's Acquisition of St. Luke's Hospital (Jan. 6, 2011), *available at* http://ftc.gov/opa/2011/01/promedica.shtm. It further stated that "The administrative complaint marks the beginning of a proceeding in which the allegations will be ruled upon after a formal hearing by an administrative law judge." (*Id.*) The FTC thereby acknowledged that the filing of the complaint marked a transition from mere investigation to full-fledged allegation.

Our conclusion that the FTC did not "allege" antitrust violations in August 2010 is consistent with other courts' findings that the FTC has broad investigatory powers and that "investigations" do not necessarily amount to "allegations." *See, e.g.*, *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (analogizing the FTC's role to that of a grand jury, which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (acknowledging that the FTC has a "legitimate right to determine the facts, and that a complaint may not, and need not, ever issue"). The FTC and the courts have recognized that even "full-phase" FTC investigations do not necessarily lead to litigation. For example, the director of the FTC's Bureau of Competition testified in connection with

a recent matter that "[t]he question of whether to recommend litigation, or to actually litigate, cannot be analyzed until the investigatory tools [subpoenas and CIDs] are used and produce relevant evidence." Order Denying Resp.'s Mot. to Compel at 2-4, *In the Matter of OSF Healthcare Sys. & Rockford Health Sys.* (2012) (FTC Docket No. 9349), *available at* http://www.ftc.gov/os/adjpro/d9349/120322aljordentrespmocompel.pdf. In *FTC v. Lights of Am., Inc.*, No. SACV 10-1333, 2012 WL 695008, at *3 (C.D. Cal. 2012) (unpublished), the district court found that "the commencement of [a] full-phase investigation or . . . the issuance of [a] CID" does not necessarily "put an institution on notice of potential litigation."

OneBeacon argues that the language of the statute authorizing the FTC to serve CIDs provides evidence that the FTC "alleged" that ProMedica had engaged in wrongdoing. The FTC's August 9, 2010, resolution authorizing the use of compulsory process and the subpoenas and CIDs issued pursuant to that resolution cite 15 U.S.C. § 57b-1, which provides that "[e]ach civil investigative demand shall state the nature of the conduct constituting the *alleged* violation which is under investigation and the provision of law applicable to such violation." 15 U.S.C. § 57b-1(c)(2) (emphasis added). While the statute refers to "alleged" antitrust violations, the August 9, 2010, resolution and the subpoenas and CIDs received by ProMedica stated only that the FTC sought to determine "whether" there may be a violation of antitrust laws. ProMedica was entitled to rely on the plain meaning of the notices that it received in order to determine whether it had been accused of wrongdoing. Moreover, the statute provides that the FTC may issue CIDs "[w]henever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to . . . antitrust

violations . . . ." 15 U.S.C. § 57b-1(c)(1). Because the FTC may issue CIDs to "any person" for the purpose of obtaining information about potential antitrust violations, the mere receipt of a CID does not indicate that the recipient is accused of antitrust violations.

OneBeacon points to language in the FTC's Operating Manual that suggests that "full-phase" investigations necessarily concern "allegations." The FTC Operating Manual states that full-phase investigations "may involve detailed inquiries into *alleged* violations of the laws and regulations enforced by the Commission withe the objective of obtaining enforcement or corrective action." FTC Operating Manual at § 3.4.1 (emphasis added), *available at* http://www.ftc.gov/foia/ch03investigations.pdf. Factors to be considered in determining whether a full-phase investigation is warranted include "[w]hether the *alleged* violations may also involve state or local law" and "[w]hether the *alleged* violations may also be remedied by private legal action." *Id.* at § 3.5.1.4 (emphasis added). OneBeacon argues that, practically speaking, "[f]ull investigations usually require a substantial commitment of resources," *id.* at § 3.2, and, therefore, when the FTC launches a full-phase investigation, it is almost certainly because there has been an antitrust violation. But the fact remains that, while the FTC's August 2010 actions may have indicated that the FTC was likely to accuse ProMedica of antitrust violations in the future, none of the FTC's actions *actually alleged* wrongdoing. ProMedica was not required to sift through the FTC's internal documents and operating procedures to determine whether the FTC's investigation was tantamount to an allegation of wrongdoing. ProMedica was not placed on notice that it was accused of antitrust violations until the filing of the FTC's complaints.

OneBeacon argues that if this court adopts ProMedica's proposed distinction between "allegations" and "investigations," it will essentially find that a "Wrongful Act" occurs only when the FTC has actually established an antitrust violation. This is not the case. An antitrust violation may be "alleged" if it is "asserted to be true as described," even if it has not yet been proved. *See Black's Law Dictionary* 87 (9th ed. 2009). In this case, the problem is that a violation was not clearly asserted in August 2010, not that the violation was not proved. OneBeacon also argues that ProMedica's urged interpretation renders the phrase "formal investigative order" in the definition of "claim" meaningless. Under the policy, a "claim" may be a "proceeding for . . . relief" "commenced by" a "formal investigative order" "against an Insured for a Wrongful Act." While it is certainly true that a "formal investigative order" may give rise to a "claim" when there is a "Wrongful Act," this is simply not the case here. The FTC's August 9, 2010, resolution authorizing compulsory process and the subpoenas and CIDs issued pursuant to that resolution did not allege antitrust violations by asserting them to be true. By adopting this reading of the policy, we do not render the "formal investigative order" superfluous or contravene the parties' intent to provide coverage for some investigations; rather, we give effect to the parties' intent as expressed in the plain language of the policy. While other formal investigative orders may give rise to a "claim" because they "allege" wrongdoing, those at issue in this case did not.

Finally, OneBeacon cites several cases in which courts have found that investigative subpoenas and CIDs gave rise to claims. *See Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461 (8th Cir. 1990); *Dan Nelson Auto. Grp., Inc. v. Universal Underwriters Group*, No. CIV 05-4044, 2008 WL 170084, (D.S.D. 2008) (unpublished); *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, No.

03 C 6067, 2004 WL 603482 (N.D. Ill. 2004) (unpublished); *Richardson Elecs., Ltd. v. Fed. Ins. Co.*, 120 F. Supp. 2d 698 (N.D. Ill. 2000). These cases are inapposite because they involve insurance policies that do not define "claim" or define "claim" differently than the insurance policy at issue here. OneBeacon cites only two cases relevant to the "Wrongful Act" question: *ACE American Insurance Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008), and *National Stock Exchange v. Federal Insurance Co.*, No. 06 C 1603, 2007 WL 1030293 (N.D. Ill. 2007) (unpublished).

In *ACE American Insurance Co.*, the district court found that an administrative subpoena and a CID constituted claims, where a "claim" included a "regulatory investigation against any Insured commenced by the filing of a[n]. . . investigative order . . . ." 570 F. Supp. 2d at 793, 798. The district court rejected the insurer's argument that neither document alleged that the insured committed a "Wrongful Act," where "Wrongful Act" was defined as "any actual or alleged negligent act, error, omission, misstatement, misleading statement or Personal Injury Offense committed by the Insured . . . ." *Id.* at 793. The district court reasoned that the subpoena, which was issued by the Maryland Attorney General's Consumer Protection Division, indicated that the insured was "the focus of an inquiry for violation of the Maryland Consumer Protection Act." *Id.* at 797. The CID, issued by the Texas Attorney General's Consumer Protection Division, "specifically mention[ed] a possible violation" of Texas law. *Id.* In *National Stock Exchange*, the district court held that the Securities and Exchange Commission ("SEC") alleged a "Wrongful Act" against the insured when it issued a "formal investigative order" stating that the SEC had information that acts of the insured "may have" violated various statutory provisions and rules. 2007 WL 1030293, at *5. The district

court found that "Wrongful Act," which was defined to include any act "allegedly committed or attempted," "necessarily include[d] acts that *may have been* committed." *Id.* at *1, 5. Therefore, each act or omission alleged in the order was a "Wrongful Act." *Id.* at *5.

These district court cases, one of which is unpublished, are not binding on this court, and we decline to follow them. Neither court analyzes the plain meaning of the term "alleged," as Ohio law requires us to do. Had the district courts done so, they might well have concluded that the subpoenas and CIDs did not "allege" wrongdoing because they did not assert the wrongdoing to be true. The district courts suggest that any subpoena or CID regarding "an inquiry," "possible" violations, or "acts that may have been committed" is sufficient to allege a "Wrongful Act," but this broad finding transforms *any* notice of an investigation that identifies the investigation's purpose into an "allegation." OneBeacon argues that it is illogical to determine whether an investigation alleges a "Wrongful Act" based on the precise wording of the notices at issue, but that is precisely the task that we must undertake.

For the foregoing reasons, the "Wrongful Act" required to meet the fourth element of a "claim" was not present in August 2010.

**B.**

Even if we were to find that there was a "Wrongful Act" because the FTC "alleged" antitrust violations, the FTC's August 2010 actions fail to meet other requirements of a "claim." Significantly, none of the FTC's August 2010 actions were "written demands" or "commenced" "proceedings" seeking "monetary, non-monetary or injunctive relief" as required by the second element of a "claim." We first examine the "relief" requirement generally, because it is relevant to

all of the FTC's August 2010 actions, and then we consider whether each of the FTC's August 2010 actions meets all four elements of a "claim."

"Relief" is undefined in the insurance policies. As previously noted, when a term in an insurance policy is undefined, Ohio courts give the term "its common, ordinary, usual meaning." *Shear*, 464 N.E.2d at 548 (citing *McBride*, 72 N.E.2d at 99). As the term is ordinarily used, "relief" means "ease from or lessening of pain or discomfort." *American Heritage Dictionary* 1044 (2d ed. 1976). In a legal context, "relief" means "the redress or benefit, esp. equitable in nature (such as an injunction or specific performance), that a party asks of a court." *Black's Law Dictionary* 1404 (9th ed. 2009); *see also Foster v. Summit Med. Sys., Inc.*, 610 N.W.2d 350, 354 (Minn. Ct. App. 2000) (recognizing that in a legal context, "'relief' refers to redress or benefit, especially equitable redress such as an injunction or specific performance").

The district court found that when the FTC launched its full-phase investigation in early August 2010, it did so "to determine whether injunctive relief is appropriate." It rejected ProMedica's argument that the definition of "claim" "require[s] a statement of immediate relief in the investigative notice" and essentially held that the "relief" requirement may be satisfied if "relief" may be sought in the future. This holding is contrary to the plain language of the policy, which requires a "written demand" or "proceeding" to seek "relief" in order to constitute a "claim." No "claim" arises absent a request for "relief."

The FTC's August 9, 2010, resolution authorizing the use of compulsory process in connection with the FTC's investigation did not seek "relief" in the form of redress or benefit from a court. OneBeacon argues that the resolution "commenced" an "administrative [or]

regulatory . . . proceeding" for such relief. However, the resolution did not "commence" anything; it merely permitted the use of compulsory process in connection with the FTC's ongoing investigation. The resolution does not meet the first element of a "claim" because it does not "commence" a "proceeding," and it does not meet the second element of a "claim" because it does not seek "relief."

The Hold Separate Agreement, pursuant to which ProMedica agreed to limit the integration of St. Luke's into its health system while the FTC investigated, also does not meet the "relief" requirement. The district court determined that the Hold Separate Agreement "is a type of injunctive relief" because it "had the practical effect, and purpose, of a temporary restraining order on ProMedica completing the acquisition." OneBeacon argues that if ProMedica had not consented to the agreement, then the FTC would have filed suit against ProMedica. Yet even if the parties' agreement served a purpose similar to an injunction, the Hold Separate Agreement was not *itself* an injunction, which may only be issued by a court. It was not a "written demand" for an injunction, and it did not "commence" a "proceeding" seeking an injunction. The Hold Separate Agreement was a contract by which ProMedica voluntarily entered into an agreement with the FTC.

OneBeacon argues, alternatively, that the FTC's August 10, 2010, letter requesting ProMedica to agree to the Hold Separate Agreement was a "written demand" on ProMedica for "non-monetary relief." Even if the FTC's letter was a "demand" and not simply a "request," as ProMedica claims, OneBeacon's argument fails. The fourth element of a "claim" requires that the "relief" sought be "*for* a Wrongful Act," in this case, an actual or alleged antitrust violation. The letter proposing the Hold Separate Agreement addressed a specific problem: the fact that ProMedica

planned to acquire St. Luke's before the FTC finished its investigation. It sought to limit the integration of St. Luke's into ProMedica's health system in case the acquisition was later found to be unlawful. The Hold Separate Agreement did not seek to redress the "Wrongful Act" at issue, actual or alleged antitrust violations. Therefore, under this interpretation, even if the first and second elements of "claim" are met because there is a "written demand" and it seeks "non-monetary relief," the fourth element is not met because such relief is not "for a Wrongful Act."

For similar reasons, the subpoenas and CIDs issued by the FTC in August 2010 do not meet the elements of a "claim." The subpoenas and CIDs sought information related to the FTC's investigation, not a remedy provided by a court. *See Foster*, 610 N.W.2d at 354-55 (finding that a subpoena *duces tecum* issued by the SEC "does not fit any reasonable reading of the term 'relief'" as it is understood in ordinary parlance or in the legal context). Therefore, they did not demand "relief" as required by the second element of a "claim." Moreover, the subpoenas and CIDs did not redress the alleged wrong; they simply enabled the FTC to further investigate whether an antitrust violation would occur if ProMedica acquired St. Luke's. Therefore, they did not meet the fourth element of a "claim."

OneBeacon contends that other courts have rejected the argument that subpoenas and CIDs merely seek information and have found that they may constitute claims. As previously noted, many of the cases that OneBeacon cites for this proposition are inapposite because they interpret policies that do not define "claim" or define "claim" without reference to "relief." *See Polychron*, 916 F.2d at 463; *Ace Am. Ins. Co.*, 570 F. Supp. 2d at 793; *Dan Nelson Auto. Grp., Inc.*, 2008 WL 170084, at *5; *Richardson Elecs., Ltd.*, 120 F. Supp. 2d 698 at 701. The most relevant case OneBeacon cites

is *Minuteman*, 2004 WL 603482, in which the court found that orders and subpoenas issued by the SEC sought "relief" and therefore constituted a "claim," which was defined as including "a written demand for monetary or nonmonetary relief made against any Insured." *Id.* at *3. The court reasoned that "[a] demand for 'relief' is a broad enough term to include a demand for something due, including a demand to produce documents or appear to testify." *Id.* at *7. It concluded that "an SEC subpoena is not a mere request for information, but a substantial demand for compliance by a federal agency with the ability to enforce its demand" by bringing suit in court. *Id. Minuteman* is distinguishable from this case, however, because the insurance policy at issue did not require relief to be "for" any kind of wrongdoing. *See id.* at *3. In contrast, ProMedica's insurance policies require that "relief" be "for a Wrongful Act." This requirement is not met here.

For these reasons, none of the FTC's August 2010 actions meets all of the elements of a "claim."

## C.

The first FTC actions to give rise to a "claim" under the insurance policies are the January 2011 complaints. The "service of [the] complaint[s]" "commenced" "proceedings" (an administrative action and a district court case) that sought "injunctive relief" against ProMedica "for" an alleged antitrust violation. ProMedica notified OneBeacon regarding the FTC actions on January 13, 2011, about a week after the complaints were filed. The claim arose while the 2010 Policy was in effect, and ProMedica notified OneBeacon within the time frame required by Section VIII of the policy's coverage section. Therefore, ProMedica should not have been denied coverage

under the 2010 Policy on the ground that its notification was untimely.[3]  The district court erred in granting summary judgment to OneBeacon on this ground.

### III.

OneBeacon argues that even if ProMedica timely notified OneBeacon of its claim, the known loss and equitable estoppel coverage defenses bar ProMedica's recovery under the 2010 Policy. OneBeacon asserted these defenses in its initial complaint, but the district court did not consider the defenses.  The district court ordered the parties, prior to conducting discovery, to file cross-motions for summary judgment to resolve only the legal question of whether ProMedica timely notified OneBeacon of its claim under the policies.

This court generally "will not address issues on appeal that were not ruled upon below" unless "the proper resolution is beyond doubt" or "injustice might otherwise result." *Maldonado v. Nat'l Acme Co.*, 73 F.3d 642, 648 (6th Cir. 1996) (internal quotations and citations omitted).  Neither exception is met here.  Given the fact-intensive nature of these defenses and the undeveloped factual record below, we think that these issues are best resolved by the trial court on remand.

---

[3]The January 2011 claim is not a "Related Claim" under the policies.  There is no earlier "claim" to which it would relate.  The "Notice of Circumstances" provision in the policies did not require ProMedica to report the August 2010 events that preceded the January 2011 claim.   The provision gave ProMedica the option to report any "Wrongful Act" of which it was aware in order to ensure that "any Claim subsequently arising from such Wrongful Act" was covered under the 2009 Policy.  A "Wrongful Act" was not present until January 2011, and even if it arose earlier, the only consequence of ProMedica's failure to report it would be its failure to preserve coverage for later claims under the 2009 Policy.  This in no way affects ProMedica's coverage under the 2010 Policy.

**IV.**

For the foregoing reasons, we vacate the district court's grant of summary judgment to OneBeacon. We remand this case to the district court for further proceedings, including consideration of OneBeacon's known loss and equitable estoppel coverage defenses.