*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0191p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARRIA SAROLI; RICHARD SAROLI,

  *Plaintiffs-Appellants,*

  *v.*

AUTOMATION & MODULAR COMPONENTS, INC.;
RICHARD A. SHORE,

  *Defendants-Appellees.*

No. 03-2395

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-70301—Gerald E. Rosen, District Judge.

Argued: December 7, 2004

Decided and Filed: April 26, 2005

Before: MARTIN and MOORE, Circuit Judges; BUNNING, District Judge.[*]

---

## COUNSEL

**ARGUED:** Mary Anne M. Helveston, Detroit, Michigan, for Appellants. Lawrence J. DeBrincat, DeBRINCAT & PADGETT, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Amy L. Stirling, HELVESTON & HELVESTON, Detroit, Michigan, for Appellants. Lawrence J. DeBrincat, DeBRINCAT & PADGETT, Farmington Hills, Michigan, for Appellees.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. Marria Saroli appeals the district court's dismissal on summary judgment of her claims against her former employer, Automation & Modular Components, and its president and part owner, Richard A. Shore, for violations, relating to maternity leave, of the Family and Medical Leave Act and Michigan's Elliott-Larsen Civil Rights Act. We AFFIRM in part and REVERSE in part, and REMAND for further consideration.

---

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

Defendants hired Saroli to serve as the Corporation's Controller, the highest-level position in its financial division, in December of 1997. In that position, she reported to the Corporation's two owners, Richard Shore and Paul Cusmano, and its general manager, Sean Mosser. Before Saroli, the Corporation had never employed a pregnant employee, and it had no specific provisions for maternity leave. Saroli became pregnant in September 2000 and was due to deliver on May 22, 2001. Shortly after she announced her pregnancy, Saroli received a $10,000 raise and a $10,000 bonus as a result of a job performance review in which Shore indicated that Saroli had "done a good job of organizing the accounting department" but showed "some examples lately of not getting the job done expeditiously or within a reasonable time frame."

After making several failed verbal requests to discuss the terms of her maternity leave, on February 26, 2001, Saroli prepared a written request. She proposed to take four weeks off immediately after her baby was born "with the exception of doing payroll every other week," and return to work full-time on September 4, 2001. She also proposed to work twenty to twenty-five hours per week from home until the end of August.

The next day, Saroli met with Shore and Mosser, who did not respond to her proposal. Instead, they informed Saroli that they had hired Shore's son, Rich Shore, Jr., to manage the accounting and finance department. They advised Saroli that her day-to-day responsibilities would remain the same, and that Shore, Jr., would review procedures and look into the job costing system, because Shore was "not happy with the way the accounting department was progressing." Defendants testified that they hired Shore, Jr., because he was able to ascertain the reason for a sharp downturn in the Corporation's profitability in the first quarter of fiscal year 2001. Shore, Jr., testified that there was no plan for Saroli's maternity leave when he was hired on March 5, 2001.

At a March 27, 2001 meeting with Shore, Saroli again raised the issue of her maternity leave. According to Saroli's deposition testimony and her notes from this meeting, Shore still did not discuss the terms of her maternity leave, other than stating that Saroli would not lose her medical coverage while on leave. Apparently, Shore distinguished between maternity leave and medical leaves previously given to two male employees who had been ill, because their illnesses were "something that [the employees] could not plan for." Shore purportedly stated that "[p]regnancy is being treated differently," and that "if [plaintiff's] husband needs to go out and get a job, that's not my fault."

In May 2001, Saroli's obstetrician ordered her to stop working for "medical reasons." Saroli prepared a memorandum stating that she would begin her leave on May 11, 2001, "per my doctor's request," and requesting resolution of her compensation during the leave. Saroli met with Shore, Mosser, and Shore, Jr., and was given a letter from Shore, stating:

> As per our discussion, the following shall apply to you during your Family and Medical Leave Act leave of absence.
>
> [The Corporation] will pay you your full salary for a maximum period of 6 weeks starting Monday [May] 14, 2001, during the Medical leave.
>
> After this period of six weeks if you choose to continue your leave of absence, you may use what ever vacation time and personal time you still have to extend this period. After this period, provided you are fit health wise to return to work, the amount of hours and work to be performed and location will be determined at that time.

Saroli testified that she found these terms "[s]atisfactory," but that she was "not a hundred percent happy." She stated that she felt that the Corporation should have given her more than six weeks of leave. She testified that she was displeased with the company's delay in resolving the issue of her maternity leave, which "led to a lot of stress."

During Saroli's leave of absence, Shore, Jr., and an accounts payable clerk performed her responsibilities, and Saroli looked for employment elsewhere. Saroli twice extended her leave, and defendants did not expect her to return and consequently made no preparations.

On the day that Saroli returned to work, she was told that she was required to present a doctor's note approving her return to work. She also was scheduled to meet with Shore and Mosser that afternoon. According to notes taken at the meeting, Shore explained that he was unhappy with her job performance. During that meeting (and in an encounter the next morning), Shore made three offers: 1) Saroli could remain employed, if she wanted to stay, and they could work together to determine new job responsibilities, which would likely be decreased; 2) she could leave, and receive a severance package with four weeks of pay and continuing medical coverage; or 3) she could remain employed for sixty to ninety days while she looked for another job and in that case the terms of her position would be addressed in the following days. Shore gave Saroli a day to consider the options.

Saroli returned the next morning to "demand her job." According to Saroli's brief, she informed Shore that she had come back prepared to work and "was shocked that she did not have a position." She says that she asked Shore whether she would be demoted if she stayed and he responded, "probably." Saroli states that, at that point, it was "obvious" to her that Shore would not allow her to return to her position as Controller or any position at the Corporation. After speaking with her attorney that morning, she told Shore that she had been treated unfairly, a demotion was unacceptable, and that Shore gave her "no other alternative but to resign effective immediately." Saroli left without giving Shore a chance to respond.

## II.

We review the district court's grant of summary judgment de novo. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* We must accept the nonmoving party's evidence, and draw all justifiable inferences in her favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Because we believe Saroli has raised a genuine issue of material fact as to whether she was constructively discharged by Automation & Modular Components, we reverse the district court's grant of summary judgment and remand the case for further consideration. Furthermore, we hold that the district court erred in concluding that Saroli's interference claims under the Family Medical Leave Act were not actionable absent a finding of constructive discharge. We do, however, affirm the district court's dismissal of Saroli's Elliott-Larsen Act claim against Shore individually.

## III.

Saroli contends that she was constructively discharged in violation of the Family and Medical Leave Act and Michigan's Elliott-Larsen Act. She also contends that defendants violated the Family and Medical Leave Act by repeatedly failing to provide her with written notice of her

eligibility for leave under the Act, by insisting that she produce her doctor's certification of her return to work, and by failing to notify her of her eligibility to take twelve weeks leave.

## A. Constructive Discharge

The Family and Medical Leave Act declares it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). To bring a successful claim under this Act, a plaintiff must show (1) that she engaged in conduct protected by the Act, (2) that the defendant was aware of this exercise of protected rights, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). Similarly, the Elliott-Larsen Act prohibits employers from discriminating based on sex, which "includ[es], but [is] not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth." Mich. Comp. Laws §§ 37.2202(1)(a), 37.2201(d). A prima facie case under this Act requires a plaintiff to show (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, (3) that she was qualified for her position, and (4) that she suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination. *Wilcoxon v. Minn. Mining & Mfg. Co.*, 597 N.W.2d 250, 257 (Mich. 1999). Both Acts require a plaintiff to show, as a threshold matter, an adverse employment action.

The adverse employment action Saroli points to in this case is her constructive discharge. Our decision in *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001), is instructive as to the meaning of the term "constructive discharge." In *Logan*, we announced that:

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.... To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

*Id.* at 568-69 (internal quotation marks and citations omitted); *see also Agnew v. BASF Corp.*, 286 F.3d 307, 309 (6th Cir. 2002) (applying the same standard in the context of a claim under the Elliott-Larsen Act). We have formally adopted the Fifth Circuit's approach to determining whether the first prong of the constructive discharge inquiry has been met, which counsels that:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). It is important to note that while the Fifth Circuit's approach aids in our constructive-discharge determination, its list of factors is not exclusive. *Id.* at 570. Additionally, although we have held that a threat of demotion standing alone does not constitute a constructive discharge, *id.* at 571, we have concluded in the past that a threat of demotion coupled with other factors is sufficient to establish constructive discharge. *See generally id.* (constructive discharge established where employee resigned after being informed that if she remained with the company she would be

demoted from server to busboy resulting in a lower salary, reduced job responsibilities, and reassignment to menial work).

Applying the *Logan* test to Saroli's claims, we conclude that Saroli has raised a genuine issue of material fact as to whether she was constructively discharged from her employment. Of primary importance is the fact that Shore's words and actions made clear to Saroli that she ought to consider resigning because if she chose to remain at the company she would "probably" be demoted. It is reasonable to infer that such a demotion would likely have resulted in a reduction in job responsibilities for Saroli and perhaps a reduction in salary. *See generally Logan*, 259 F.3d at 570-573.

The mere fact that a demotion would have "probably" occurred if Saroli had not resigned is by itself insufficient to raise a genuine issue as to whether a constructive discharge occurred in this case. There is other circumstantial evidence, however, that indicates that a reasonable person in Saroli's position would have felt that Shore created an intolerable working environment with the intent of forcing Saroli to resign. When this evidence is considered in its totality, along with the Saroli's probable demotion, we believe that Saroli has presented sufficient evidence to defeat the defendants' motion for summary judgment.

From the outset, Shore made the process of obtaining maternity leave exceedingly difficult, which "led to a lot of stress" for Saroli. Shore refused numerous attempts by Saroli to ascertain the maternity leave which would be offered to her. Shore also made comments which indicated his displeasure with her attempt to exercise her right to maternity leave and indicated that Shore felt maternity leave ought to be treated differently from other forms of medical leave such as illness. Shore's statements during his deposition indicate that this displeasure with Saroli could be based on his, and by extension the company's, disparaging views toward women. For example, during his deposition, Shore referred to the "girls" at the company six times and did not once use the words female or women to describe his employees. Additionally, there were no pregnant employees at the company nor any maternity-leave policy at the company prior to Saroli's request for leave.

Shore's actions after he learned that Saroli would be requesting maternity leave could also be viewed as evidence that Shore intended to create an intolerable working environment in order to induce Saroli to quit. The day after Saroli submitted to Shore a written request for maternity leave, Shore informed her that his son had been hired as the manager of accounting and finance. Furthermore, Shore told Saroli that she would now be reporting to Shore's son, with whom Saroli had unpleasant past interactions, including on several occasions, his expressing the belief that eventually he would have her job. Prior to this change, Saroli held the highest level position in the company's financial department and had reported directly to the company's owners. According to Saroli, Shore's son then began to assume many of the duties that Saroli had previously performed.

Finally, Shore's conduct when Saroli attempted to return to work at the conclusion of her maternity leave suggests that he neither expected nor desired her to return to the company. Shore failed to inform Saroli until the day she returned to work that she would need a doctor's note in order to be cleared to resume work. Saroli also found upon her return that her computer account had not been reactivated and her work had been taken from her desk. As a result of these problems, Saroli was unable to resume her usual job tasks until approximately 3:30 p.m., at which point she was summoned by Shore into a meeting about the future of her employment at the company.

At this meeting Shore's actions indicated his desire to have Saroli resign from her position at the company. Shore laid out Saroli's options in the following order: (1) Saroli could resign and obtain a severance package, (2) she could remain employed at the company for sixty to ninety days while she looked for alternate employment and then resign, or (3) she could stay at the company in an undetermined role. When Saroli expressed her desire to remain at the company, Shore then

indicated that she would "probably" be demoted if she remained. Shore refused, however, to elaborate on what her new role at the company would entail.

In sum, based upon the evidence introduced by Saroli as to Automation & Modular Components's actions towards her both prior to and following her maternity leave, we conclude that Saroli has raised a genuine issue as to whether she was constructively discharged from Automation & Modular Components. Despite the fact that she has raised a genuine issue of material fact as to her constructive discharge, in *Jager v. Nationwide Truck Brokers, Inc.*, 652 N.W.2d 503 (Mich. Ct. App. 2002), the Michigan Court of Appeals held that individual liability for discrimination claims does not exist under the Elliott-Larsen Act. *Id.* at 511-515. "In determining a question of Michigan law, this court is bound by decisions of the state's intermediate appellate courts unless convinced that the Michigan Supreme Court would decide the question differently." *United of Omaha Life Ins. Co. v. Rex Roto Corp.*, 126 F.3d 785, 789 (6th Cir. 1997). Given that Saroli has presented no evidence suggesting that the Michigan Supreme Court would have found individual liability to exist under the Elliot-Larsen Act, we affirm, pursuant to *Jager*, the district court's dismissal of Saroli's Elliott-Larsen Act claim against Shore individually. We reverse and remand for further consideration Saroli's claims under the Family Medical Leave Act and her Elliott-Larsen Act claim against Automation & Modular Components.

### B. Interference Under the Family and Medical Leave Act

Saroli also argues that defendants interfered with her rights under the Family and Medical Leave Act by failing to respond timely to her requests for leave, failing to inform her of her eligibility to take twelve weeks of leave, and demanding medical certification of her ability to return to work. The district court found that defendants' failures were not actionable, concluding that their "borderline non-compliance with the procedural requirements of the statute" was of no consequence because Saroli was ultimately granted maternity leave. In a footnote, the district court explained:

> The parties do not address . . . whether [these] alleged violations would give rise to a private cause of action under the [Act], or what sort of relief Plaintiff might be entitled to recover if she is able to establish these violations. The Court's own research indicates that no such private right of action exists, absent conduct by an employer that violates [section] 2615 of the statute. [citations omitted]
>
> In this case, Plaintiff was, in fact, granted leave under the [Act]. She has not challenged either the length or the terms of this leave as granted by Defendants; rather, she alleges that Defendants retaliated against her protected activities of requesting and taking this leave. Yet, the Court already has determined that this retaliation claim fails for lack of any adverse employment action. It follows that any failure by Defendants to provide a particular form of notice required under the [Act] cannot, separately and by itself, sustain a claim under this statute. [citation omitted]

The district court found that Saroli's other claims under the Family and Medical Leave Act are not actionable absent a finding of constructive discharge. We disagree.

This Court analyzed the reach of the Family and Medical Leave Act in *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713, 726 (6th Cir. 2003). We found that the Family and Medical Leave Act entitles qualifying employees experiencing serious health conditions to certain protections, including the right to take leave. *Id.* at 719; *see* 29 U.S.C. § 2612(a)(1)(D). We also noted that the Act forbids "'any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act].'" *Id.* (quoting 29 U.S.C. § 2615(a)(1)). The regulations specify that "'[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.'" *Id.* (quoting 29 C.F.R. § 825.220(b)). Thus, a violation of the Act is actionable.

To prevail on an interference claim, a plaintiff must establish that (1) he is an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the Act, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee benefits to which he was entitled. S*ee Arban v. West Publ'g Corp.*, 345 F.3d 390 (6th Cir. 2003). The only element in dispute is whether the Corporation denied Saroli the benefits to which she was entitled.

Saroli alleges, and defendants concede, facts that prove the alleged violations. Saroli notified defendants of her need to take maternity leave and defendants did not respond, in violation of 29 C.F.R. § 825.208(a), (c) (requiring employer to respond for leave in writing within two business days designating the leave as a Family and Medical Leave Act leave and notifying the employee whether it is to be paid or unpaid). Also, defendants should have informed Saroli of her eligibility under the Act to take twelve weeks of maternity leave. *Arban*, 345 F.3d at 401 (noting that the issue in a claim of interference with entitlements under the Act is "simply whether the employer provided its employee the entitlements set forth in the [Act]—for example, a twelve-week leave or reinstatement after taking a medical leave"). The facts show that defendants did not so inform her; instead, they offered Saroli six weeks of leave. Such interference is sufficient to create the necessary inference that defendants discouraged Saroli from exercising her rights. *See id*. at 402 (stating that "[i]nterfering with" an employee's rights under the Act includes "discouraging an employee from using leave."). Saroli also alleges facts that show that defendants required her, without notice, to present a fitness-for-duty certification. This also violates the Act. *See* 29 C.F.R. §§ 825.301(b)(1), (2) (stating that employer's response must detail the employee's rights and obligations under the Act, including whether the employee must present a fitness-for-duty certificate to return to work).

In sum, Saroli sufficiently alleges violations of the Act. Defendants' failure to respond to her requests discouraged her from taking leave and made it impossible for her to make the necessary plans. The only question is whether the Act provides a remedy for such violations.

Employers who violate section 2615 are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1). In *Cavin*, 346 F.3d at 726, we found that "[e]ven when an employee proves that his employer violated [section] 2615, [section] 2617 provides no relief unless the employee has been prejudiced by the violation." In cases where prejudice is shown, the employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). *Cavin*, 346 F.3d at 726. The remedy is tailored to the harm suffered. *Id*. (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 88-90 (2002)). We remand this issue to the district court for a determination, consistent with this opinion, of whether the Act provides compensation or other damages for the alleged violations.

## IV.

For the foregoing reasons, we AFFIRM the district court's judgment as to Saroli's Elliott-Larsen Act claim against Shore individually and we REVERSE the district court's judgment regarding Saroli's remaining claims and REMAND for further consideration consistent with this opinion.