NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0321n.06

Case No. 17-1961

<table>
<tr><td rowspan="2" width="50%"><strong>UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT</strong></td><td><strong>FILED</strong><br>Jun 27, 2018<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

| | | |
|---|---|---|
| THOMAS RUSSELL, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CSK AUTO CORPORATION, N/K/A | ) | MICHIGAN |
| O'REILLY AUTOMOTIVE, INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

CLAY, Circuit Judge. Plaintiff Thomas Russell ("Russell") appeals from the judgment entered by the district court dismissing with prejudice Russell's lawsuit alleging that Defendant CSK Auto Corporation, n/k/a O'Reilly Automotive, Inc. ("O'Reilly") violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and breached their contract. For the reasons set forth below, we **AFFIRM** the decision of the district court.

## BACKGROUND

### I. Factual History

Russell was an employee at O'Reilly for 25 years from June 14, 1988 to September 9, 2013, and a store manager for the last sixteen of those years. When Russell began his career, the company was called Murray's Discount Auto Stores. It later became CSK Auto ("CSK"), and

then O'Reilly in 2008, after O'Reilly purchased CSK. When O'Reilly acquired CSK, the pay structure changed. CSK maintained a salary-based compensation system, whereas O'Reilly maintained a commission-based system. Under the commission-based system, managers would receive a lower base salary plus a commission tied to their stores' sales. However, to ease the transition between the two systems, O'Reilly put the managers on an "assurance pay" plan. With assurance pay, managers were given the same base pay figure, and then an assurance pay figure, which was designed to keep their income close to what it had been under the salary system. The plan was temporary. Russell was first given assurance pay in April 2009. His base pay was $2,225 and his assurance pay was $2,575.

On August 27, 2010, Russell sprained his ankle and was instructed by his doctors not to go to work. Later, Russell took FMLA leave from September 28, 2010 until December 21, 2010. On September 24, 2010, before he went on FMLA leave, Russell was removed from assurance pay and, while on leave, was transferred from the Waterford store to the 24 and Hayes store, a slower store within the district.[1] Russell submitted a resignation letter on December 6, 2010. After receiving the letter, Dan Gdowski ("Gdowski"), Russell's regional manager, set up a meeting with Russell to discuss the issues contained in his resignation letter. After the meeting, Russell was placed back on assurance pay and transferred to the Lapeer store, where he remained until 2013. Russell alleges that at that meeting, Gdowski made a promise that as long as the sales at Russell's store continued to grow, he would stay on the assurance plan.

In December 2012, Russell once again took FMLA leave after undergoing umbilical hernia surgery. He was on leave from December 14, 2012 to January 14, 2013. In January 2013, Russell

---

[1] Russell admitted that before his assurance pay was taken away, he asked to be transferred from the Waterford store.

was removed from assurance pay. On February 14, 2013, Russell was notified that he had been removed from assurance pay. Russell set up another meeting with Gdowski to discuss his removal. The reason provided was time—that it "was a matter of just time." (R. 70, Trial Tr., PageID # 1257.) After several months, in September 2013, Russell was informed that his pay would not be reinstated and he would not be transferred to a higher-volume store. Russell submitted his resignation letter and his last day was September 9, 2013.

## II.    Procedural History

On November 3, 2014, Russell filed a complaint against O'Reilly alleging: (1) intentional and willful violation of the FMLA; (2) intentional infliction of emotional distress; and, (3) breach of contract. First, Russell alleged that O'Reilly intentionally and willfully violated the FMLA by retaliating against him by "removing him from the assurance plan after being on FMLA," by interfering with his FMLA rights, and by constructively discharging him. (R. 1, Complaint, PageID # 4.) Second, Russell alleged that O'Reilly's conduct was "extreme, outrageous, and of such character as not to be tolerated by a civilized society" and "resulted in severe and serious emotional distress." (*Id*. at # 5.) Finally, Russell alleged that he and O'Reilly entered into an oral contract in which O'Reilly agreed to pay Russell "assurance pay" provided his store sales increased yearly and until "his commissions were equal to his assurance pay." (*Id*. at # 6.) Russell alleged that his sales did increase, and O'Reilly breached the contract by failing to keep him on assurance pay.

On October 13, 2015, Russell filed a motion for partial summary judgment on the issue of constructive discharge. On October 13, 2015, O'Reilly filed a motion for summary judgment on all of Russell's claims. On September 30, 2016, the district court denied Russell's motion for

partial summary judgment, denied O'Reilly's motion for summary judgment, and dismissed with prejudice Russell's claim for intentional infliction of emotional distress.[2]

The district court held a bench trial on June 5, 2017. On July 26, 2017, the district court issued findings of fact and conclusions of law. On July 26, 2017, the district court entered judgment against Russell, dismissing his lawsuit with prejudice. The court found that O'Reilly "did not interfere or retaliate against Plaintiff in violation of the FMLA when Plaintiff was removed from the Assurance Pay Plan," did not constructively discharge Russell, and did not breach its contract "because no contract existed between the parties guaranteeing that Plaintiff could remain indefinitely on the plan." (R. 65, Opinion, PageID # 1171.)

On August 16, 2017, Russell timely filed his notice of appeal.

## DISCUSSION

### I. FMLA Retaliation

#### Standard of Review

"On an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo.*" *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004)). "When the factual findings involve credibility determinations, we afford great deference to the district court's factual findings." *Id*. (citing *Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999)). "Under the clear-error standard, we abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 625 (6th Cir. 2016)

---

[2] Russell agreed to dismiss the intentional infliction of emotional distress claim.

(alterations and internal quotation marks omitted) (quoting *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013)).

## Analysis

"The FMLA entitles qualifying employees up to 12 work weeks of leave under specified circumstances, including if they are suffering from a serious health condition." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016) (citing 29 U.S.C. § 2612(a)(1)(D)). An employer is prohibited from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). An employer is also prohibited from "discharg[ing] or in any other manner discriminat[ing] against any individual" for taking FMLA leave. *Id*. § 2615(a)(2). An employer who violates the FMLA is liable to the employee for damages. *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009) (citing 29 U.S.C. § 2617(a)(1)).

This Court has recognized "two discrete theories of recovery under the FMLA: (1) the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Hunter*, 579 F.3d at 691; *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir. 2003)). A plaintiff may proceed under both theories, but the proof required for each is different. *Tennial*, 840 F.3d at 307–08. "The interference theory has its roots in the FMLA's creation of substantive rights, and 'if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,' regardless of the intent of the employer." *Seeger*, 681 F.3d at 282 (alteration omitted) (quoting *Arban*, 345 F.3d at 401). By contrast, the "central issue raised by the retaliation theory . . . is 'whether the employer took the adverse action because of a prohibited reason or for a legitimate

nondiscriminatory reason.'" *Id.* (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). In other words, in interference claims "employers burden or outright deny substantive statutory rights to which their employees are entitled," whereas in retaliation claims "employers initiate adverse employment actions against employees for exercising their FMLA right to take leave." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012) (citation omitted). An employer's motive is relevant in a retaliation claim "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Seeger*, 681 F.3d at 282 (citing *Edgar*, 443 F.3d at 508).

Russell asserts that his FMLA rights were violated under both theories. We first address Russell's retaliation claim. An employer may not discriminate or retaliate against an employee for taking FMLA leave. 29 U.S.C. § 2615(a)(2). "In particular, an employer is prohibited from 'us[ing] the taking of FMLA leave as a negative factor in employment actions.'" *Hunter*, 579 F.3d at 690–91 (citing 29 C.F.R. § 825.220(c); *Arban*, 345 F.3d at 403). In order to establish a claim for FMLA retaliation, a plaintiff must demonstrate that: "(1) he engaged in an activity protected by the Act, (2) this exercise of his protected rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial*, 840 F.3d at 308 (citing *Arban*, 345 F.3d at 404).

The parties do not dispute the first three elements: (1) Russell was engaged in a statutorily protected activity when he went on FMLA leave in December 2012; (2) O'Reilly knew Russell was on FMLA leave; and, (3) Russell suffered an adverse employment action when he was removed from assurance pay. Russell, then, needed to demonstrate a causal connection between the FMLA leave and the adverse employment action. At trial, the question for the district court

was whether O'Reilly's stated reason for removing him from assurance pay was pretextual and whether the true reason for his removal was his medical leave. *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). The district court found against Russell, concluding that O'Reilly removed Russell from assurance pay "because his performance as store manager did not produce profits sufficient enough to cover [Russell's] salary under the plan," (R. 65, Findings, PageID # 1175) and that this reason was not pretext for discrimination. We do not think the district court's conclusion on the ultimate question of retaliation was clearly erroneous.

Turning to the evidence presented at trial, O'Reilly offered a legitimate, non-discriminatory reason for Russell's removal from assurance pay. Gdowski testified that the reason was that the sales at Russell's store did not justify his overall compensation. Gdowski testified that the assurance pay system was a temporary system instituted to ease the transition from a salary-based system to a commission-based system after O'Reilly took over from CSK. He testified that the O'Reilly model was designed to tie the managers' compensation to the performance of the stores. The company wanted the store managers to "be paid off the store." (R. 70, Trial Tr., PageID # 1371.)

O'Reilly was concerned about the number of managers on assurance pay. For example, on May 2, 2012, a regional manager sent an email reminding the other regional managers that "[they] need to consistently review the assurances of [their] store managers to make sure they are in line with store sales, store profitability." (*Id*. at # 1357.) This email was forwarded to Gdowski by Scott Leonhard, the divisional vice president. Apparently the regional manager was alarmed, or "almost has had a heart attack," to learn about the rate of assurance pay. (*Id*. at # 1390.) Gdowski knew that this "was something [he] needed to look into." (*Id*. at # 1392.) He characterized the

email to the managers as saying "hey, guys, we have to be sure our AP plans are in line with our stores." (*Id*.)

Gdowski testified that he would periodically receive a list from corporate containing the names of managers whose assurance pay had expired or would soon expire. When Gdowski received that list, he needed to review those managers to determine whether their assurance pay should be extended or whether it should be left to expire. Gdowski testified that he received a list from corporate with Russell's name on it. He testified that the managers he included in his January 2, 2013 email were the managers that corporate told him to review. He testified that he would have received this list three weeks to 30 days "ahead of time." (*Id*. at # 1356, 1359.) This list would have contained information about the managers, including their pay information (both base and assurance), when they started on assurance pay, and when they last had their assurance pay reviewed.

As part of his review of the expiring assurances, Gdowski testified that he needed to evaluate the performance of the store managers and make sure "the payroll dollars fit and match the volume of the store." (*Id*. at # 1362, 1373.) He testified that Russell was removed because he was not good enough for his assurance pay, because he was not performing well enough to justify that high of a salary. Russell had one of the highest base pays, and also one of the highest assurances of the store managers. That was because his salary at CSK had been higher because he had been with the company for so long. Because Russell's assurance pay was so high, his breakout number (the number of sales needed for Russell's commission to equal his assurance pay number) was also a lot higher than other store managers' breakout number. Gdowski testified that Russell had been on assurance pay for 46 months and was "one of the longer tenured managers on assurance." (*Id*. at # 1373.) Gdowski testified that he was the second from last removed from the

CSK conversion. He testified that the timing was right to remove Russell because they were going into a new year and with "volumes picking up in the months of March, April, May, that it was time . . . that Mr. Russell came off assurance." (*Id*. at 1373–74) He testified that the timing would allow Russell to "get as close to that assurance breakout number as [he could]." (*Id*. at # 1374.) Gdowski also testified that the store had the potential to support Russell's pay at the level he had been receiving under the salary-based system and the opportunity was there for Russell. [3] Russell testified that at the meeting with Gdowski following his removal, the reason Gdowski provided for the action was the length of time that he had been on assurance pay. [4]

As part of the assurance pay review, Jeff Young ("Young"), Russell's district manager, would make a recommendation to Gdowski about whether someone should remain on assurance pay. Young testified that he recommended that Russell remain on assurance pay because he would take a "hit" if he came off assurance at that point, and because he was performing well and "hitting his numbers or getting close to his numbers." (*Id*. at # 1331–32, 1336.) Gdowski testified that Young did not protest Gdowski's decision to remove Russell from assurance pay. He testified that Young "agreed that it was time to take [Russell] of[f] assurance." (*Id*. at # 1382.) Either way, Gdowski was the ultimate decision maker and he testified that he made the decision for the reasons explained above.

---

[3] On appeal, O'Reilly relies heavily on an argument that Russell received a two-year opportunity at the Lapeer store. The ending of that two-year period would have coincided with the decision in early January to remove Russell from assurance pay. For instance, Gdowski said "And that was discussed with him that, okay, we are going to give you an opportunity after two years based on what he was making and based on his desire to be close to home and not willing to move . . . ." (*Id*. at #1366–67, 1390.) However, we are skeptical of this reason because it is loosely mentioned at trial only twice, is not a reason relied on by O'Reilly before the district court, and is not mentioned by the district court. If there had actually been a two-year opportunity, we would have expected this to be mentioned much more frequently at trial by O'Reilly and by the district court. Consequently, we are hesitant to rely on this reasoning, as O'Reilly suggests.

[4] This undermines Russell's suggestion on appeal that O'Reilly's reasoning was cooked up in anticipation of this litigation.

Gdowski testified that he removed many store managers from the plan. Young testified that he supervised eleven store managers during the period of time in which he supervised Russell, and seven or eight of them were taken off assurance pay. Additionally, when Russell was removed from assurance pay, one other person was removed at the same time, and that person had been on assurance pay beginning around the same time as Russell in 2009. Only one other person on the list had been on assurance pay longer than Russell, and everyone else had been on significantly less time than that. Gdowski testified that "many" store managers had lost money when they were initially taken off assurance pay, and that other store managers had lost a similar amount to what Russell lost when he was taken off. (R. 70, Trial Tr., PageID # 1377, 1381.) For example, of 28 store managers removed, 19 initially lost compensation.

In light of this evidence, we do not believe that the district court clearly erred in finding that Russell was removed "because his performance as store manager did not produce profits sufficient enough to cover [Russell's] salary under the plan." (R. 65, Findings, PageID # 1175.)

However, in order to show that O'Reilly's reason was actually pretextual, Russell points to temporal proximity, retaliation after his first use of FMLA leave, Russell's superior performance, and "the fact that other employees with similar circumstances were left on assurance pay and others were given raises after coming off assurance pay." (Russell Rep. Br. at 15.). First, the timing of Russell's removal from assurance pay is highly suspicious. Russell began his FMLA leave in December 2012 and returned from leave on January 14, 2013. An email on January 2, 2013 from Gdowski provided that Russell would be removed from assurance pay as of January 31, 2013. Russell was told by Young that he was removed from assurance pay on February 14, 2013. The next day, Russell received a check and the assurance pay had already been removed. In sum, the decision to remove Russell from assurance pay was officially communicated to

- 10 -

corporate while Russell was in the middle of his FMLA leave and Russell was officially removed from assurance pay a few weeks after his return from FMLA leave.

Next, Russell points out that he was previously removed from assurance pay around the time he left for FMLA leave. On August 27, 2010, Russell sprained his ankle and was instructed not to return to work until September 13, 2010. Russell then went on FMLA leave from September 28, 2010 until December 21, 2010. Prior to taking leave, on September 24, 2010, Russell was informed that he would be removed from assurance pay. Apparently the decision was also made around that date. Russell argues, then, that he was only ever removed from assurance pay when he took FMLA leave.[5]

Additionally, Russell highlights the fact that he was a good performer, one of the best in his district. Russell scored well individually in relation to other managers and his store scored well in relation to other stores. For instance, Russell significantly increased sales at the Lapeer store and increased the net profits of the store 150.37% from 2011–2012. Russell notes that when he arrived at the store it had a loss of $92,626, and in 2012, the store had a positive profit of $ 26,953. Russell ranked first in his district from 2011–2013 in terms of audit scores. Moreover, Young never discussed any performance issues with Russell and described his performance as "very high," as "one of [the] better managers in [his] district," and "a go-to person."

But Gdowski acknowledged Russell's performance and never suggested that Russell was performing poorly. Gdowski's point was that even though Russell was performing well and was improving overall sales at the Lapeer store, his sales were still insufficient to support the

---

[5] By contrast, Gdowski testified that the 2010 assurance pay decision was based upon performance concerns. He testified that Russell was not meeting sales expectations, was spending "excessive" amounts on overtime, and was not consistently doing required sales calls. (*Id*. at # 1361.) The district court does not appear to have made findings about why Russell was removed from assurance pay in 2010.

compensation that he had been receiving. Gdowski testified that the relevant information was whether the sales at the particular store would justify the manager's salary. And Russell admits that "it is true that his store sales were not covering his commissions." (Russell Br. at 22.) Gdowski testified that in making the decision he did not look beyond the individual store and compare it with other stores. The district court could have, and did, credit Gdowski's testimony that "[d]espite the increase in internal net profit during [Russell's] tenure at the store, the profits were insufficient to compensate [Russell] at the salary he was receiving while on the Assurance Pay Plan." (R. 65, Findings, PageID # 1174, 1179–80.)

Russell also argues that O'Reilly's reason was pretextual based on the fact that other employees remained on assurance pay longer than Russell or received more favorable treatment after coming off assurance pay by getting a raise. Russell cites one person who remained on assurance pay longer than Russell and another person who received a raise. For instance, Yvonne Cronin's assurance pay was extended through till March 31, 2013, even though she had been on assurance pay for 47 months. He argues that the only difference between the two is Cronin's non-use of FMLA leave. But Gdowski testified at trial that the two were *not* similarly situated. For instance, he noted that Cronin was at a new, unestablished store and that it would be unfair to take her off assurance pay before she had enough time to allow the sales to grow and build the store. Russell also pointed to Eric Frederick who was put on and removed from assurance pay at the same time as Russell. He notes that Frederick got a $50 raise to his base pay two months after he was removed from assurance pay. However, even after Frederick's raise, Russell still made $300 more in base pay than Frederick. And there is no information in the record about why Frederick received the raise.

We do not think that Russell has shown that these two other employees were similarly situated. *See Parks v. UPS Supply Chain Sols., Inc.*, 607 F. App'x 508, 515 (6th Cir. 2015) ("Parks points to other employees who he alleges were not discharged although they were similarly situated. Before the Court can make a comparison, Parks must demonstrate that the comparables were similarly situated in all relevant respects and that they engaged in acts of comparable seriousness."). Additionally, Russell was only able to provide two examples, which is not overwhelming when most other managers were removed long before 46 months and did not receive raises. Furthermore, the district court explicitly looked to what it considered were other "similarly situated managers," who were removed after less time or a similar period of time, and who also suffered a reduction in pay after they were removed. (R. 65, Findings, PageID # 1181.).

Russell also points to the policy of assurance pay to argue O'Reilly's proffered reason is pretextual. He argues that O'Reilly's reason—that Russell was removed from assurance pay because his assurance pay was higher than his commissions based on store sales—could not be a reason because this was true for all managers and the reason the system was created in the first place. He asserts that because this reason is not unique to Russell, it "simply becomes pretextual." (Russell Br. at 19.) But it was not a precondition of removal that the manager's commissions be above the assurance pay. As already explained, Gdowski testified that other managers were removed from assurance pay before their commissions reached their assurance pay amount and lost income when they were removed from assurance pay. Young also testified that store managers had received a "hit" when they were removed, although he testified that none took as great of a hit as Russell. (R. 70, Trial Tr., PageID # 1343.) Additionally, Gdowski testified that the assurance pay system was guaranteed for only one year, which would bring Russell to about the end of 2010.

Finally, Russell points to the fact that there is no documentation that Russell's assurance pay was set to expire and no email from Gdowski to Young discussing whether Russell should be removed. O'Reilly admitted that there are no documents from the time of the removal that state the reason for Russell's removal. By contrast, Russell produced evidence of emails to Gdowski indicating when managers' assurance pay was set to expire and evidence of email chains discussing the pros and cons of removing other managers from assurance pay. But Gdowski testified that he had received that email from corporate and that Russell's name was on the list. He also testified that he discussed the removal with Young. And in the same document where O'Reilly admits that they do not have certain documents, they also admit that those kinds of records do not exist for all employees, even though they do for some. Additionally, all of the emails offered by Russell are dated after Russell was removed, and one is from as late as August 25, 2014.

In all, the most powerful evidence that O'Reilly's reason for removing Russell from assurance pay was pretextual is the temporal proximity and the fact that he was previously removed from assurance pay near the only other time he took FMLA leave. These facts are certainly suspicious. However, we do not believe that two examples combined with temporal proximity is enough to disrupt the district court's conclusion in light of the other evidence in the record. We do not believe that the district court clearly erred in finding that Russell was removed "because his performance as store manager did not produce profits sufficient enough to cover [Russell's] salary under the plan," (R. 65, Findings, PageID # 1175) or that O'Reilly's reason was not pretext for discrimination.

Accordingly, we affirm the district court's conclusion that Russell's retaliation claim fails.

## II.  Constructive Discharge

### Standard of Review

"On an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Lindstrom*, 424 F.3d at 492 (citing *Pressman*, 384 F.3d at 185).

### Analysis

Russell also contends he was constructively discharged in violation of the FMLA. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005). This Court has previously analyzed constructive discharge claims under the retaliation theory of liability. *Id*. ("The adverse employment action [plaintiff] points to in this case is her constructive discharge.").

"To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (internal quotation marks and alterations omitted) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (quoting *Moore*, 171 F.3d at 1080).

To determine whether the first prong of a constructive discharge claim has been met, the court considers a number of factors.

> Whether a reasonable person would have fe[lt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job

responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)); *Saroli*, 405 F.3d at 451.

The district court concluded, based on a number of factors articulated in *Logan*, that Russell was not constructively discharged. The court reasoned that Russell was not demoted after being removed from assurance pay, but remained store manager, that Russell presented no evidence that his job responsibilities were reduced or that he was reassigned to menial or degrading work, or that he was reassigned to work under a younger supervisor. It noted that his reduction in pay was "less favorable," but that his income would increase if he increased his sales. (R. 65, Findings, PageID # 1184.)

Contrary to the district court, Russell argues that the removal from assurance pay and resulting reduction in pay "created intolerable working conditions, as perceived by a reasonable person." *Savage*, 665 F.3d at 739. Turning to the *Logan* factors, Russell was not demoted, did not experience a reduction in job responsibilities, was not reassigned to menial or degrading work, was not reassigned to work under a younger supervisor, was not badgered, harassed, or humiliated by anyone at O'Reilly to encourage his resignation, and was not provided offers of early retirement. However, because he was removed from assurance pay and subsequently received less money, Russell did establish that there was a reduction in salary and continued employment on terms less favorable than the employee's former status. And Russell produced evidence that he lost $6,115.52 from February 2013 to September 2013 as a result of being switched to the

commission system and losing his assurance pay. The actual losses he experienced month to month ranged from $391.49 in June to $1,182.06 in February. On average, Russell lost about $700 a month. Russell's annual wage would have been $58,903.00 had he remained on assurance pay. These losses represent a significant percentage of Russell's monthly and yearly salary.[6]

Nevertheless, there was also evidence that the assurance pay system was a temporary system instituted to ease the transition from a salary-based system to a commission-based system after O'Reilly took over from CSK. Russell testified that he understood that the assurance pay system was temporary. The store managers were told that they would be taken off assurance pay. O'Reilly was concerned about the number of managers on assurance pay, and was working to ultimately remove all of their managers from assurance pay. In fact, many store managers were removed from the plan by Gdowski, and most of them lost pay switching to the commission-based system. And seven or eight of the eleven managers that Young supervised were taken off assurance pay.

Further, we do not believe Russell produced evidence that O'Reilly took Russell off assurance pay with the intention of forcing him to quit.[7] Again, Russell's removal from assurance pay took place in the context of a company trying to move from a salary-based system to a commission-based one. The company's goal was to get all of its managers off the temporary assurance pay plan. And Russell received one of the highest assurance pays, received one of the highest base pays, and had been on assurance pay for a much longer period of time than average,

---

[6] The district court focused on the fact that Russell could have increased his sales. But it seems problematic to suggest that a significant reduction in pay cannot equate to an intolerable working condition if an employee could theoretically increase their income by increasing their sales. That would make it hard for anyone making a commission to prove their case.

[7] The district court did not reach the question of O'Reilly's intent because it resolved the claim on the basis that Russell had not shown intolerable conditions.

even though his store's sales did not justify his compensation. Additionally, both Young and Gdowski testified that Russell was a good performer and had done good work with the Lapeer store, so it seems unlikely that they would want him to quit. In his reply brief, Russell argues that because O'Reilly did not restore Russell's assurance pay in 2013, even though it did in 2010, O'Reilly intended Russell to quit. But we are not persuaded by this argument. We do not believe there is evidence in the record suggesting that O'Reilly removed Russell from assurance pay with the intention of forcing him to quit.

Because Russell has not shown that O'Reilly "deliberately created intolerable working conditions . . . with the intention of forcing [Russell] to quit," *Savage*, 665 F.3d at 739, we affirm the district court's conclusion that the constructive discharge claim fails.

## III. FMLA Interference

### Standard of Review

As detailed above, "[o]n an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Lindstrom*, 424 F.3d at 492 (citing *Pressman*, 384 F.3d at 185).

### Analysis

An employer may not interfere with any right created under the FMLA. 29 U.S.C. § 2615(a)(1). To succeed on an FMLA interference claim, a plaintiff must demonstrate that:

> (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled.

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)). An employer's intent is not relevant to this inquiry. *Edgar*, 443 F.3d at 507.

The parties do not dispute the first four elements: (1) Russell was an eligible employee; (2) O'Reilly was his employer as defined under the FMLA; (3) Russell was entitled to leave under the FMLA between December 2012 and January 2013; and, (4) Russell gave notice to take leave. The parties dispute whether O'Reilly denied Russell FMLA benefits to which he was entitled.

After a period of FMLA leave, an employer must restore the employee to his previous position or its equivalent. 29 U.S.C. § 2614(a)(1); *Hunter*, 579 F.3d at 690 (citing 29 U.S.C. § 2614(a)(1)). "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status." 29 C.F.R. § 825.215(a). "Equivalent pay includes any bonus or payment, whether it is discretionary or non-discretionary, made to employees . . . ." *Id*. § 825.215(c)(2).

However, an employee "has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). "Both the statute and the DOL regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar*, 443 F.3d at 508. A plaintiff can seek to rebut the defendant's proffered justification. *Romans*, 668 F.3d at 841.

The district court concluded that O'Reilly did not interfere with Russell's rights under the FMLA because Russell "has failed to show what FMLA benefits he was denied." (R. 65, Findings, PageID # 1182.) The court reasoned that Russell was "allowed to take FMLA twice. He was not

discouraged from taking his FMLA leave in 2012–2013, shortly before his removal from the plan." (*Id.*) Russell argues that the district court failed to determine whether O'Reilly interfered with Russell's FMLA rights when it restored him to a position without assurance pay upon his return to work.

However, the district court did find in relation to Russell's retaliation claim that O'Reilly removed Russell from assurance pay because "his performance did not produce profits sufficient enough to cover [Russell's] salary under the plan," and that O'Reilly's proffered reason was not pretext for discrimination. (*Id*. at # 1175, 1180–81.) This finding also applies here and supplies the "legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar*, 443 F.3d at 508. And as explained above, we cannot say that the district court clearly erred in so finding. Russell's interference claim, then, falls for the same reason that his retaliation claim does.

Accordingly, we affirm the district court's conclusion that Russell's interference claim fails.

## IV. Breach of Contract

### Standard of Review

Again, "[o]n an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Lindstrom*, 424 F.3d at 492 (citing *Pressman*, 384 F.3d at 185).

### Analysis

Under Michigan law, a breach of contract claim has four elements: "(1) the existence of a contract between the parties, (2) the terms of the contract require performance of a certain action by the defendant, (3) the defendant breached its obligation to perform, and (4) the plaintiff incurred

damages as a result of the breach." *I.B. Mini-Mart II, Inc. v. JSC Corp.*, No. 296982, 2011 WL 1435978, at *2 (Mich. Ct. App. Apr. 14, 2011) (citation omitted).

"To state a breach of contract claim under Michigan law, a plaintiff must first establish the elements of a valid contract." *Parson v. Urban Ins. Adjusters, Inc.*, No. 273098, 2007 WL 3088588, at *1 (Mich. Ct. App. Oct. 23, 2007) (quoting *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003)). Under Michigan law, "[a] valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 830 (Mich. 2016) (citation omitted). "Before a contract can be completed, there must be an offer and acceptance." *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995). "The party seeking to enforce a contract bears the burden of proving that the contract exists." *AFT Michigan v. State of Michigan*, 866 N.W.2d 782, 804 (Mich. 2015) (citing *Hammel v. Foor*, 102 N.W.2d 196 (Mich. 1960)).

Russell argues that there was a contract between O'Reilly and Russell providing that Russell would remain on assurance pay so long as his sales continued to increase. The district court concluded that there was insufficient evidence "to establish [the existence of] a contract stating [Russell] would remain on the Assurance Pay Plan for an indefinite period of time." (R. 65, Findings, PageID # 1186.)

At trial, Russell testified that Gdowski made him a promise that as long as his sales continued to grow, he would stay on the assurance plan. As evidence of this agreement, Russell points to an email sent by Gdowski to Russell, in which Gdowski referenced a "bargain." The email said:

> Tom, I agree [the Lapeer store] has made significant strides in 2011 and trust me it has not gone unnoticed. The success of the store relates directly to your leadership you have provided for the team and your ability to inspire [team members] to achieve store goals. I appreciate your efforts and thank you for holding up your end of the bargain we discussed last December. Making money is not an easy task at that store with the rent factor, but you and the team overcame the obstacles and drove sales and made some money, good job. Stay focused. [District manager] opportunities will become available in 2012.

(R. 70, Trial Tr., PageID # 1250; Russell's Appendix I, Plaintiff's Exhibit 10, at 16.) By contrast, Gdowski testified that he never promised Russell that he would be on assurance pay so long as he increased his sales. Gdowski also testified that his language, specifically the language about district manager opportunities, was intended to "inspire and motivate" Russell. (R. 70, Trial Tr., PageID at # 1418.)

Young testified that Gdowski told Russell that as long as his sales continued to grow that he would remain on assurance pay, that "[a]s long as the man does his job, he will remain on assurance as long as he possibly can." (*Id*. at # 1320–30.) Apparently this was not an unusual statement to make to an O'Reilly employee. However, Young also testified that Gdowski "never promised" that Russell would remain on assurance pay as long as his numbers increased. (*Id*. at # 1341.) Young distinguished between mentioning and promising. (*Id*. at # 1342–43.)

Because the district court could have credited Gdowski's and Young's testimony that there was no promise made to Russell that he would stay on assurance pay so long as his sales increased, we cannot say the district court's finding was clear error. Even though Gdowski used the phrase "bargain" in the email, it is not clear that he was referencing an agreement to keep Russell on

assurance pay as long as his sales increased.[8]  Because there is little more than the parties' own testimony, we are reluctant to say the district court's finding amounts to clear error.

Consequently, the district court did not err in determining that Russell produced insufficient evidence to establish a contract.  Accordingly, we affirm the district court's conclusion that Russell's breach of contract claim fails.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the decision of the district court.

---

[8] Again, a couple of times, Gdowski seemed to loosely reference a two-year opportunity given to Russell at the Lapeer store with assurance pay.  (*Id*. at #1366–67.)  On appeal, O'Reilly argues that any bargain referenced in the email would have referred to this agreement.  (O'Reilly Br. at 43.)  As explained above, we are skeptical of this reason.  *See supra* note 3.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** By the time this case reached the trial stage, only one question remained in Thomas Russell's unlawful retaliation claim—whether "the true reason for [his] dismissal was [his] medical leave." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). In answering this question, the district court was required to "find the facts specially and state its conclusions of law separately." FED. R. CIV. P. 52(a). "Findings should be comprehensive and relevant to the issues so as to provide a rational basis for the trial court's decision." *Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 792 (6th Cir. 1984). Though we do not require district courts presiding over bench trials "to prepare elaborate findings on every possible issue raised at trial, . . . there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which an ultimate conclusion can rationally be predicated." *Id.* Here, the district court's efforts fail even this "liberal standard." *Id.*

At trial, Russell presented a host of evidence to prove that his medical leave was the real reason for his extreme drop in pay. For instance, to rebut Dan Gdowski's claim that Russell was removed from assurance pay because he had been on assurance pay for a long time and had not adequately increased sales at the Lapeer store, Russell elicited testimony from Gdowski that another O'Reilly employee—Yvonne Cronin—had been on assurance pay for even longer than Russell and had received an extension of her assurance pay at the same time that Russell's assurance pay was cut off, even though Cronin's sales also did not cover the cost of her assurance pay. R. 70 (Trial Tr. at 182–84) (Page ID #1397–99); D.E. 21, App'x to Pl.'s Br., Vol. II, Ex. 5 at 31–32. Gdowski testified that he had extended Cronin's assurance pay because she had been transferred to a brand-new store, while Russell had been transferred to an established store. R. 70 (Trial Tr. at 200) (Page ID #1415). Russell, however, testified that the Lapeer location had also

switched stores in May 2012—i.e., during the course of Russell's two-year tenure as manager of that store. *Id.* at 106–07 (Page ID #1321–22).

The proper resolution of this dispute mattered to Russell's case: if Cronin and Russell were similarly situated, then Gdowski's differential treatment of the two employees would be strong evidence that discrimination—and not Russell's inability to nearly double sales at the Lapeer store within two years—drove his decision to remove Russell's assurance pay. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2012) ("Discrimination cases frequently turn on whether the plaintiff can identify one or more comparators who are similarly situated in all relevant respects."). The district court, however, never acknowledged Russell's arguments about Cronin and never decided whether Cronin was similarly situated to Russell. Instead, the district court's Findings of Facts and Conclusions of Law merely noted that "similarly situated managers at other stores also were removed from the Assurance Pay Plan," and "[t]wo other store managers that were removed had taken FMLA leave." R. 65 (Findings of Fact and Conclusions of Law at 12) (Page ID #1181). The district court never identifies who among the other store managers were similarly situated to Russell. To the extent the district court believed that the two other managers who had taken FMLA leave and been removed from assurance pay were relevant comparators, such a finding would have been clearly erroneous. Neither manager had taken FMLA leave immediately before being deprived of assurance pay, as Russell had. Rather, one of those two managers took FMLA leave three years *after* his or her assurance pay ended, D.E. 21, App'x to Pl.'s Br., Vol. II, Ex. A at 100, which renders his or her experience entirely inapposite to the case at hand. The other manager returned from FMLA leave five months *before* being initially placed on assurance pay. *Id.* Because the record shows only that Gdowski eventually removed this manager from assurance pay, and thus does not reveal whether Gdowski was involved in the earlier decisions to grant or

maintain the manager's assurance pay, there is no way to know whether this manager was treated better by Gdowski after taking FMLA leave than Russell was.

The district court's failure to assess whether Cronin and Russell were similarly situated is reversible error, particularly in light of the otherwise vague or erroneous findings highlighted above. We cannot tell from the Findings of Fact whether the district court (a) found that Cronin was similarly situated, but then erroneously determined that the experiences of the two other store managers identified above outweighed any evidence of unlawful discrimination, or (b) found that Cronin was not similarly situated, such that Russell had failed to provide sufficient evidence of discrimination to win his case. While the latter decision might not be clearly erroneous, the former decision would be. As we lack a "clear understanding of the basis for the trial court's decision," remand for "clarification and/or further consideration" is warranted. *Grover Hill*, 728 F.2d at 792–93. The majority sees it differently, and I therefore respectfully dissent.

Because the viability of Russell's unlawful-interference claim also turns on whether Russell was removed from assurance pay for a "legitimate reason unrelated to the exercise of FMLA rights," *see* Maj. Op. at 19 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)), I dissent from the majority's resolution of that claim, as well.